Christel TRUMPS, Plaintiff,

v.

TOASTMASTER, INC., Defendant.

No. 94 Civ. 7080 CSH.

United States District Court, S.D. New York.

July 16, 1997.

---

Steven Sarshik, Garden City, NY, for Plaintiff.

Ross & Hardies, New York City (J. Joseph Bainton, John G. McCarthy, of counsel), Stinson, Mag & Fizzel, Kansas City, MO (Robert O. Lesley, Mark A. Stites, of counsel), for Defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge:

In this diversity action to recover for personal injuries, the Court is asked to consider whether the opinion of plaintiff's expert on liability passes muster under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("*Daubert*"), and if it does not, whether defendant is entitled to summary judgment under Rule 56, Fed.R.Civ.P., dismissing the complaint.

### Background

According to the allegations of the complaint, the affidavits submitted on this motion, and the record developed during discovery, on April 15, 1993 plaintiff Christel Trumps was employed as a kitchen helper at Harry's Bar and Mindy's Restaurant, facilities maintained at the New York Helmsley Hotel, at 212 East 42nd Street, in Manhattan.

During that day, a time came when Trumps, working in the kitchen, received an order from a waiter to cook a chicken breast sandwich. Trumps sought to execute that order by using an electric grill manufactured by defendant Toastmaster, Inc. Trumps says in her affidavit at ¶ 6 that when she received the chicken breast sandwich order, there was bacon cooking on the grill. Her affidavit continues: "I put the chicken on the grill, and I felt a sharp tingling or shock in my right hand and this continued up my right arm to my right shoulder and face. I was propelled backward and I fell off my feet." *Id.*

At her deposition, Trumps testified that she was not touching the grill when the incident occurred. She testified at Tr. 95:

"[A] When I put, the chicken on it went like I guess right to the chicken and me, and I said shit and I flew back and I remember I jumped back. The light came out here.

Q. So you are saying that no part of your hand touched the grill?

A. I had the chicken in my hand.

Q. So the chicken was touching the grill, not your hand?

A. Right."

Trumps further testified that no other part of her body was touching the grill, unless she was standing on its extension cords, which she did not recall doing. Tr. 95–96.

The medical records submitted on this motion indicate that Trumps was treated at the emergency room of the New York University Medical Center from April 16 to 19, 1993. Dr. Jesse Blumenthal, a New York State Workers' Compensation Board physician, examined Trumps on April 16. His examination revealed an "electrical burn of right 3rd finger, edema of right forearm," with attendant "tenderness and swelling." The Medical Center's discharge diagnosis on April 19 was "effect adverse electric current (shock)." According to a report dated February 8, 1996 by Dr. Irving Friedman, a neurologist who examined Trumps for the first time on January 16, 1996 Trumps received follow-up treatment from Dr. Howard Richman, who diagnosed "electric current injury, right upper extremity, neck and face . . ."; and from Dr. Francine DiGiovanni, a psychiatrist, who diagnosed "post–traumatic stress disorder, major depressive episode, current and chronic . . ." Dr. Friedman states that Trumps "has attended the Manhattan Center for Pain Management for persistent pain in her right hand, elbow and shoulder." Dr. Friedman found "marked tenderness and swelling of the entire right extremity and forearm," with grip strength "decidedly diminished on the right," and continuing pain in the right shoulder, so that "[s]he is totally incapacitated from using her right upper extremity to the extent that she cannot even dress herself without assistance." Dr. Friedman states his opinion "with a reasonable degree of medical certainty that the accident of April 15, 1993 was the competent producing cause of Mrs. Trumps' above noted injuries and current clinical picture."

Jose Polanco, the chief engineer for the Helmsley Hotel, testified that he examined the grill twice after the accident, probably the day after the accident and subsequently, when an OSHA inspector came to investigate. Polanco tested the griddle in his office and had no problems with it. The OSHA inspector, after having interviewed hotel employees (apparently not including Trumps), ascribed the accident to "electrocution." Polanco testified that thereafter the grill disappeared; "[m]ost likely somebody took it home." Tr. 21–22.

Trumps commenced this action in mid–1994 in the New York State Supreme Court, New York County. She named as defendants various entities associated with the hotel, and Toastmaster. Toastmaster removed the case to this Court on the ground of diversity of citizenship, contending that the other defendants, whose presence would have destroyed complete diversity, had no conceivable liability, a view with which the Court ultimately agreed, dismissing those other defendants from the action and thereby preserving diversity jurisdiction, since Trumps is a citizen of New York and Toastmaster is a Missouri corporation.

The complaint pleads three theories of recovery against Toastmaster: negligence, breach of the implied warranty of the griddle's merchantability, and strict liability based upon the allegation that the griddle was defective.[1]

The plaintiff's expert witness, on the issue is Michael Kaufmann, a mechanical engineer, who has given opinions on the cause of the accident. Kaufmann has been deposed by counsel for Toastmaster and has submitted an affidavit with exhibits on this motion.

Toastmaster now moves in limine to preclude Kaufmann from testifying at the trial. The gravamen of Toastmaster's motion is that the Court, exercising its "gatekeeper" function under *Daubert*, should rule Kaufmann's opinions inadmissible; and then, in the resulting absence of proof on liability, grant Toastmaster summary judgment dismissing Trumps' complaint.

---

1. These theories are pleaded in the second, third, and fourth causes of action respectively. The first cause of action is apparently confined to the conduct of the other defendants, subsequently dismissed from the action.

*Discussion*

Rule 702, Fed.R.Evid., allows opinion evidence by a qualified expert to be adduced at trial "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue ..." As the Second Circuit observed in *F.D.I.C. v. Suna Associates, Inc.,* 80 F.3d 681, 686 (2d Cir.1996), "[i]t is well established that expert testimony must be based upon reliable theories or principles" to be admissible in evidence (citation and internal quotation marks omitted). Prior to the Supreme Court's decision in *Daubert,* courts applied the "general acceptance" test articulated in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). *Daubert* held that the Federal Rules of Evidence, with its "liberal thrust," superseded the "rigid general acceptance requirement" of *Frye,* 509 U.S. at 588, 113 S.Ct. at 2794. Nonetheless, *Daubert* cautions that "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* at 590, 113 S.Ct. at 2795. The Second Circuit has said that "[t]he Federal Rules of Evidence, although concededly more liberal than the *Frye* test, still require a determination that the proffered scientific evidence is both relevant and reliable." *United States v. Kwong,* 69 F.3d 663, 668 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1343, 134 L.Ed.2d 491 (1996). Most recently, the Second Circuit held in *Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 81 (2d Cir.1997) that "[i]n admitting expert testimony, a trial court must determine whether the expert's reasoning and methodology can appropriately be applied to the facts of the case before it" (citing *Daubert* ).

*Daubert* places upon trial judges "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597, 113 S.Ct. at 2799. To assist trial judges in navigating on these post–*Frye,* newly uncharted seas, the *Daubert* Court articulated a non–exclusive list of factors that trial judges should consider in deciding whether or not to admit expert opinion evidence. Those factors include: "(1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; and (3) the known or potential rate of error associated with a particular scientific technique." *Suna Associates,* 80 F.3d at 687 (citing *Daubert;* internal quotation marks omitted). While *Daubert* continues to regard whether the theory is generally accepted as a relevant factor, the Court stressed that "a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of the fact will be whether it can be (and has been) tested." 509 U.S. at 593, 113 S.Ct. at 2796. That is because, the Court explained, "[s]cientific e today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Id.* at 593, 113 S.Ct. at 2796.

In the light of this authority, I will consider the proffered opinions of plaintiff's expert witness Kaufmann and whether they satisfy the *Daubert* critera.

*The Proffered Opinions*

While as noted the griddle involved in the incident was not preserved by the hotel staff, Kaufmann examined "an exemplar griddle" furnished to him for that purpose at the offices of Toastmaster's New York counsel. Kaufmann Report dated May 7, 1996 at 7. The griddle was equipped with an electric temperature control unit at one of its ends, from which pin terminals led to the griddle's electric heating element. Kaufmann's final conclusions, as set forth in his affidavit,[2] are as follows:

"This accident occurred because the metal surfaces of the griddle were not grounded, and the design and instructions of Toastmaster allow the use of cooking oils or grease on this griddle without leveling the griddle. This allowed grease or cooking oil to run over the end of the griddle and onto the exposed electrical contacts between the heat-control and the griddle

---

**2.** This paragraph taken from the affidavit reproduces the final paragraph of Kaufmann's written report dated May 7, 1996, except for the correction of an apparent typographical error.

heating element creating an electrical path from the electrical contacts to the metal cooking surface of the griddle."

May 7, 1996 Report at 12. The accident and injury to plaintiff indicate, in Kaufmann's opinion,

"that the bacon grease from the bacon, which she was cooking on this griddle, had entered the area of the probe and its electrical connections, causing an electrical short to the metal frame of this griddle. When she placed the chicken on the griddle her fingers made contact with the metal surface of the griddle. This allowed a current to flow from the electrical connection of the heat control to the frame of the griddle, to her fingers and it started up the nerves and blood vessels of her fingers into her arm."

May 7, 1996 Report at 11.

These conclusions are preceded in Kaufmann's written report by descriptions of the griddle he examined. A grease cup slides under the griddle in the middle on one side. A drain hole is positioned over the grease cup. Kaufmann noted "[a] burr ... all around the inside of this hole." May 7, 1996 Report at 8. There are recesses along the ends and sides of the griddle; in the area of the drain hole, the recess is approximately 0.740 inches wide.[3]

Kaufmann also relied upon the declarations of others. His report states at 2 that on February 22, 1996, he had a telephone conversation "with Mr. Jiminy El Gamil, who was the electrician at the Harley Hotel at the time of this accident." Gamil told Kaufmann that he examined the griddle immediately after the accident, and observed that "[t]he male plug was burned. There was a positive and negative lead but no grounding. The male plug from the cord had one leg from the inside melted like wax." Id.[4]

Kaufmann also had in mind Trumps' deposition testimony. At a deposition given on September 20, 1995, Trumps said of the legs and wheels upon which the griddle stood: "[T]he wheels was kind of damaged. So this thing wasn't so straight like it stands now, it was crooked." Tr. 94 (emphasis added). In an affidavit verified on September 11, 1996, responding to this motion, Trumps expands upon her deposition testimony to say: "The wheels on the cart were somewhat damaged and the cart was not absolutely *straight*" (emphasis added). Kaufmann interprets these declarations to mean that the griddle was not *level* at the time of the incident, an interpretation I am prepared to accept for the purposes of this motion.

In these circumstances, Kaufmann concluded that "this electric griddle was manufactured in negligent, dangerous and hazardous condition," because the electrical contacts between the griddle and the heat–control unit were insufficiently guarded from grease; the recess around the perimeter of the cooking surface was insufficient to prevent grease and cooking oils from spilling onto those electrical contacts; the burr in the drain hole in the recess "was sufficient to create surface tension and create a blockage for cooking oils and greases to drain from this recess into the grease cup," thereby creating an overflow of cooking oils or greases in the area of the heat-control and electrical connections; and that Toastmaster's instruction manual did not stress the importance of using the griddle on a level surface. March 7, 1996 report at 11–12.[5] These defects, in his opinion, account for the theory of causation with which Kaufmann concludes his report, and which I have previously quoted.

*Qualifications*

■ To determine their admissibility at trial, Kaufmann's opinions must be evaluated

---

**3.** Kaufmann examined another exemplar Toastmaster griddle on April 15, 1995 at his laboratory, and a revised heat–control unit on March 1, 1996. His report at 10–11 describes his observations. I do not understand then to be central to his conclusions as to how the incident occurred.

**4.** Toastmaster says that Gamil's hearsay declaration cannot be considered. But an expert in forming an opinion may take into account mate-

rial that would not be admissible itself, Rule 703, Fed.R.Evid., and so for present purposes I will not disregard Kaufmann's account of his conversation with Gamil.

**5.** Kaufmann makes other criticisms of the griddle, but in light of his ultimate conclusions, I view the criticisms summarized in text as central to his theory of causation.

in the light of *Daubert* and its progeny. The first inquiry relates to his qualifications to express these opinions. That is problematical because, while Kaufmann's opinions are unquestionably scientific in nature, the science involved is electricity: that mysterious and miraculous force which Dr. Franklin introduced to mankind with his kite, leading to all of electricity's subsequent benefits and hazards to humanity. Scientists who specialize in electricity are called electrical engineers. In the case at bar, Toastmaster is advised by an electrical engineer: James L. Kirtley, Jr., who is a professor of electrical engineering at M.I.T. and holds bachelor's, master's, and doctoral degrees in electrical engineering. Kaufmann is not an electrical engineer. He is a mechanical engineer. I say that not in denigration of a demanding discipline, but to suggest that, at least in relation to Dr. Kirtley, Kaufmann is out of his field.[6] *See Stagl,* 117 F.3d at 81 ("In determining whether an expert is sufficiently knowledgeable to be admitted to testify, one of the factors that the district court ought to consider is whether other experts exist who are more specifically qualified and who are nonetheless not in the employ of the company or industry whose practices are being challenged.").

Kaufmann's shortcomings in the field of electrical engineering were explored during his deposition, Tr., 79–93, from which it appears that, as a mechanical engineer, he devotes a substantial amount of his time to slip and fall cases; that his work experience embraces only a limited involvement with electrical engineering; that he belongs to no electrical engineering professional societies, has published no articles, in that field, holds no electrical patents, and was unable to identify any authoritative texts or articles about electrical engineering.

At his deposition, Kaufmann could not explain Kirchoff's voltage law, Farraday's law, "let-go current," or the range of minimum perceptible current in human beings. Tr.

111–112. At ¶¶ 12–16, Kirtley's affidavit states with persuasive authority that these laws and concepts, esoterically unfamiliar to the lay person (at least to this one) and presumably to lay jurors, are in fact (1) basic to a rudimentary understanding of electrical engineering, and (2) squarely implicated by the facts of this case.

In the law of product liability, defects leading to the imposition of civil liability must be either in design (the original design is flawed), or in manufacture (the design was sound but the particular product involved in the accident was improperly constructed). *See Voss v. Black and Decker Manufacturing Co.,* 59 N.Y.2d 102, 463 N.Y.S.2d 398, 401, 450 N.E.2d 204, 207 (1983). Because the griddle involved in the case at bar, through no fault of Toastmaster, is not available for inspection, the only potentially viable claim is one for a defective design. *Healey v. Firestone Tire & Rubber Co.,* 212 A.D.2d 351, 622 N.Y.S.2d 246, 247, *rev'd on other grounds,* 87 N.Y.2d 596, 640 N.Y.S.2d 860, 663 N.E.2d 901 (1996).

I hold that Kaufmann, who proffers no alternative design of his own, is not qualified to express an opinion that within the relevant context of electrical engineering, Toastmaster's design of this model griddle was defective. *See Stagl,* 117 F.3d at 81 ("[A] district court: may properly conclude that witnesses are insufficiently qualified ... because their expertise is too general or too deficient. "); *Compare Bogosian v. Mercedes–Benz of North America, Inc.,* 104 F.3d 472, 477 (1st Cir.1997) (plaintiff claimed design defect in an automobile; trial court "acknowledged that Davidson [plaintiff's proffered expert] was a very well qualified master mechanic, but ruled that his expertise did not extend to the design defect issue at hand"; First Circuit affirmed, observing that "at most, Davidson had extensive experience in automotive repair. His background shows a lack of any significant expertise—by way of knowledge,

---

6. Kaufmann's *curriculum vitae* states that he is also is a "professional engineer in safety" licensed by California, and has been certified as a "safety professional" by the Board of Certified Safety Professionals of America, Inc. These designations, while undoubtedly deserved, do not

shed much light on the existence *vel non* of Kaufmann's qualifications to express opinions in the field of electricity. Kaufmann's highest academic degree is a bachelor's degree in mechanical engineering, awarded by the Worcester Polytechnic Institute in 1962.

skill, experience, training, or education—in relevant areas such as the design or manufacture of automobiles or their components.") (internal quotations omitted).

*Underlying Methodology*

Kaufmann's methodology was limited to visually inspecting an exemplar griddle, reading Toastmaster's instruction book, and plugging the griddle in to measure the heat it generated and the electrical power it drew.

■ Significantly, Kaufmann did nothing to address the "key question" articulated in *Daubert* of whether his theory of causation "can be (and has been) tested." Kaufmann did not use his laboratory to test whether grease from the surface of the griddle could find its way to the electrical connections of the heat–control unit, thereby generating a hazardous flow of electricity back to the griddle surface and from there to the body of a person using the griddle. But there is no basis to conclude that Kaufmann's hypothesis *could not* be tested; Kirtley conducted such a test, which he describes in his affidavit at ¶ 6. Kirtley was unable, using first bacon grease and then a more conductive solution, and applying those substances to the electrical components of the heat–control unit, to generate sufficient "leakage" electrical current to be perceptible to a griddle user.[7]

The other *Daubert* factors are not as directly implicated by the particular facts of this incident. Toastmaster makes other criticisms of Kaufmann's opinions which, in the view I take of the case, I need not consider at length.[8] I am satisfied that Kaufmann's lack of qualifications in electrical engineering, and the inadequacies of his methodology (a factor which probably follows from the first.), viewed separately or in combination, constrain me to hold that Toastmaster's motion in limine succeeds, and Kaufmann cannot testify to the proffered opinions at trial.[9]

7. I am not deciding this motion in Toastmaster's favor because I regard Kirtley as a more persuasive expert witness than Kaufmann. If Kaufmann's proffered opinions passed muster under *Daubert*, it would be for the jury to decide which, if either, expert witness' testimony it chose to accept. But Kirtley's affidavit is a legitimate source of information for the Court with respect to Kaufmann's qualifications in electrical engineering, the impact of a lack of knowledge in that field upon the facts of this particular case, and the feasibility of testing Kaufmann's causation hypothesis. *See Stagl*, 117 F.3d at 81–82.

8. One of these criticisms is based upon Kirtley's reasoning that even if the griddle were capable of delivering a perceptible electric shock, "an electrical circuit could not have been completed" because, according to Trumps' testimony, she was standing on a rug or floor mat, wearing shoes with rubber or plastic soles, and, "[s]ince no other part of her body was touching anything that would conduct electricity away from her, the electricity would not have flowed into her in the first place." Affidavit at ¶ 9. I do not base my decision upon that reasoning, which appears to argue that nothing happened to Trumps on April 15, 1993, at least nothing electrical in nature. Viewing Trumps' account of the incident and the contemporaneous medical evidence in the light most favorable to plaintiff, as the non-moving party on a motion for summary judgment, there is sufficient proof to show for Rule 56 purposes that (to borrow Kurt Vonnegut's title) "Something Happened." The difficulty for the plaintiff at bar is that she bears the burden of proving *what* happened, or to state the matter more precisely, proving a cause in fact sufficient to visit liability upon Toastmaster. To satisfy that burden, Trumps relies solely upon Kaufmann's opinions; but, for the reasons stated in text, those opinions are not admissible under Rule 702, Fed. R.Evid.

9. It is pertinent to note that not every post-*Daubert in limine* movant has persuaded the Second Circuit that the challenged expert opinion should be discarded as "junk science." In *Stagl*, 117 F.3d at 81–82, an action for personal injuries suffered by plaintiff who, while waiting for a luggage carousel to produce her suitcase, was struck by a suitcase that was hit by another suitcase being retrieved by a passenger, the Court of Appeals held that a witness with a master's degree in mechanical engineering, whose "field of expert, knowledge is the interaction between machines and people," was qualified to give opinion testimony for plaintiff. In *Suna Associates, Inc.*, 80 F.3d at 687, where the expert testified as to the value of foreclosed property, the Court of Appeals noted in regard to the expert's testimony "that the valuation method he used was a hybrid of two widely-recognized methods and was the most appropriate method for valuing the class of property at issue." In *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 525 (2d Cir.1996), an action by government to recover costs incurred in the cleanup of hazardous substances in landfills, the Court of Appeals said: "Dr. Brown relied on the methodology and data typically used and accepted in these sorts of cases, and his testimony would therefore be admissible under *Daubert*." (citations omitted).

These cases demonstrate qualifications of the witnesses, and factors militating in favor of admitting their opinions, that are lacking in the case at bar.

*Summary Judgment*

It follows from the exclusion of Kaufmann's opinion evidence that Toastmaster's motion for summary judgment must be granted.

 Summary judgment is appropriate if it appears that the non–moving party cannot prove an essential element in its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In the case at bar, the presence of a design defect in the Toastmaster griddle and a causal connection between that defect and plaintiff's injuries are essential elements in her case under all three theories of liability. Plaintiff nowhere suggests that she has any evidence addressing either of these issues other than the opinions of Kaufmann, which are not admissible.

### Conclusion

For the foregoing reasons, the defendant's motions *in limine* and for summary judgments are granted.

The Clerk of the Court is directed to dismiss the complaint with prejudice.

It is SO ORDERED.