The CAYUGA INDIAN NATION OF NEW YORK, et al., Plaintiffs,

·and

The Seneca–Cayuga Tribe of Oklahoma, Plaintiff–Intervenor,

v.

George E. PATAKI, as Governor of the State of New York, et. al., Defendants.

Nos. 80–CV–930, 80–CV–960.

United States District Court, N.D. New York.

Jan. 19, 2000.

Mariscal Weeks McIntryre & Friedlander, Phoenix, Arizona, for plaintiff-intervenors; Glenn M. Feldman, of counsel.

Rubinbaum, LLP, New York City, for plaintiffs Cayuga Indian Nation of New York; Raymond J. Heslin, Martin R. Gold, of counsel.

Hon. Eliot Spitzer, Attorney General of the State of New York, Albany, NY, for State defendants; David B. Roberts, Assistant Attorney General, of counsel.

Huber Lawrence & Abell, New York City, for defendant New York State Electric & Gas Corporation; Theodore F. Duver, of counsel.

Goodwin Procter & Hoar, Boston, Mass., for Miller Brewing and defendant Class; Anthony M. Feeherry, of counsel.

Harris Beach & Wilcox, Rochester, NY, Brian Laudadio, William L. Dorr, of counsel, for defendant Counties.

Hank Meshorer, U.S. Department of Justice, Environment & Natural Division, Washington, D.C., for United States Special Litigation Section.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

### *Introduction*[1]

It is an understatement to say that particularly in recent years the parties' damage theories have been fluid. After

---

1. The court assumes familiarity with the protracted and extensive prior proceedings in this action. Suffice it to say for now that the issue before the court, yet again, is the manner in which the subject property should be valued.

eighteen years of litigation and sporadic, unsuccessful negotiation attempts, faced with the harsh reality of a trial, in July, 1998, the parties made the first of several motions pertaining to damages. Then, there was no agreement as to how to calculate damages. In fact, even parties whose interests were closely aligned, such as the State of New York ("the State") and Cayuga and Seneca Counties, on the one hand, and the Cayuga Indian Nation of New York, the Seneca–Cayuga Tribe of Oklahoma,[2] and the plaintiff-intervenor, the United States ("the U.S."), on the other, were unable to agree as to an appropriate valuation methodology in this case.

Since July, 1998, at times with the court's guidance, and at times without, the parties have refined, redeveloped and repeatedly analyzed various theories of calculating damages in this case. What has remained constant, however, is the parties' inability to agree upon a single methodology which should be employed to value the subject property. This disagreement is understandable given the paucity of directly relevant case law, coupled with the lack of a directly applicable methodology for the unique factual situation which this case presents: How to compensate the Cayugas, in monetary terms, for the fact that through two separate transactions with the State they were dispossessed of their ancestral land in violation of the Indian Trade and Intercourse Act, and have remained out of possession of that land for the past 204 years.

Not surprisingly, the parties turned to expert witnesses to establish the value of the subject property. Each of the three proffered real estate appraisers tackled the daunting task of property valuation in different ways. The experts' varying approaches can by succinctly described a follows. John F. Havemeyer, III, who testified on behalf of the Tribal plaintiffs, invokes a sales comparison approach. The U.S.' expert, Arvel Hale, employs a quantitative model which, in addition to real estate appraisal principles, relies upon computer science, mathematics and statistics. The appraiser upon which the State is relying, John D. Dorchester, Jr., offers yet another model; this one qualitative in nature, also incorporates appraisal principles and, among other things, relies upon economics and history.

■ Given this conflict as to the proper valuation methodology to be employed here,[3] as the court recognized in *Cayuga Indian Nation v. Pataki,* Nos. 80–CV–930, 80–CV–960, 1999 WL 1279338 (N.D.N.Y. Dec. 23, 1999) ("*Cayuga XII* "), it has an obligation to act as a "gatekeeper" to determine the admissibility of this conflicting expert testimony. *Id.* at *14. In fulfilling that obligation, as it is entitled to do, prior to jury selection the court conducted a seven day hearing to determine, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny the admissibility of the proffered testimony of the three real estate appraisers. *See*

**2.** Hereinafter these two plaintiffs will be collectively referred to as "the Tribal plaintiffs."

**3.** The court is fully cognizant of the proposition that ordinarily "[a]lthough calculation of the amount of damages is a factual determination, the formula used in making that calculation is a question of law." *Vermont Microsystems, Inc. v. Autodesk, Inc.,* 138 F.3d 449, 452 (2d Cir.1998) (citation omitted). Indeed, this court has invoked that rule on at least one prior occasion. *See Niagara Mohawk Power Corp. v. Stone & Webster Engineering, Corp.,* No. 88–CV–819, 1992 WL 121726, at *34 (N.D.N.Y. May 23, 1992). In

fact, for some time now, the parties have been urging, without success, that this court determine, as a matter of law, that one or the other of the various suggested property valuation methods is *the* method by which the jury should award damages, if any, in this case. Because of the novel facts of this case and, as it turns out, because the record as presently constituted shows that there are two possible valuation methods which can be used here, the court finds inapplicable the general rule cited above, and mentioned by the Tribal plaintiffs during the December 20, 1999 argument.

*Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, ——, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999) ("The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable.").

### Discussion

### I. Qualifications

■ Because Messrs. Havemeyer, Hale and Dorchester were all offered as expert witnesses, at the outset the court must consider whether each of these individuals is qualified to testify as such. "The Federal Rules of Evidence permit opinion testimony by experts when the witness is 'qualified as an expert by knowledge, skill, experience, training or education,' and '[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Zuchowicz v. United States,* 140 F.3d 381, 386 (2d Cir.1998) (quoting Fed.R.Evid. 702). During the *Daubert* hearing, each of the proffered witnesses demonstrated that they have sufficient knowledge, skill, training and education to establish themselves as experts in terms of their "specialized knowledge" as to real estate appraisal. Indeed, with one slight exception which will be discussed below, in terms of their qualifications, none of the parties seriously challenged the ability of the three proffered real estate appraisers to testify in this case. Thus, in keeping with the Second Circuit's liberal interpretation of Rule 702, governing expert testimony,[4] because Havemeyer, Hale and Dorchester amply demonstrated through their respective curriculum vitae, and through their testimony, that they each have a "reliable basis in knowledge and experience," so that they are qualified to testify as experts on the issue of valuation methodology herein, the court finds that all three appraisers are qualified to testify as to that issue. *See Kumho,* 526 U.S. at ——, 119 S.Ct. at 1175.

Before leaving the issue of qualifications, the court observes that at one point during the course of Dorchester's testimony it was implied that perhaps he was not qualified to testify insofar as he is using economic theory and statistical analyses in his valuation methodology. After hearing Mr. Dorchester's testimony, however, and after having the opportunity to more carefully review his report, particularly in those two respects, the court finds that although Mr. Dorchester is neither an economist nor a statistician, that does not mean that he is unqualified to rely upon those disciplines as part of his appraisal methodology in this case. Likewise, the fact that Mr. Hale is not a mathematician, a statistician, nor a computer scientist, does not render him unqualified to rely upon those disciplines as part of his appraisal methodology.

Given the increasingly complex world in which we live, it is a fact of modern day life that many problems cannot be resolved without taking an interdisciplinary approach. Thus, the fact that both Hale and Dorchester relied upon other disciplines in devising their respective valuation models is of little consequence in terms of their qualifications to testify, particularly where, as here, each witness demonstrated his proficiency in the use of such disciplines in the context of real estate appraisal. Accordingly, as to the qualifications of the three appraisers, the court finds that each of them have the credentials, through education, training and experience, to offer their respective opinions as to the manner

---

4. *See McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir.1995) (engineer's practical experience qualified him to testify as an expert in a product liability action against the manufacturer of hot-melt glue as to the issue of whether plaintiff was in the "breathing zone" of the glue's fumes in the workplace, despite his alleged lack of formal education as to fume dispersal patterns or experience in interpreting air quality studies).

in which the subject property should be valued.

## II. Daubert Principles

■ With respect to the admissibility of expert testimony, whether scientific, or whether based upon "technical" or "other specialized knowledge," the Supreme Court has adopted a two-step inquiry in which trial judges must engage to determine "whether the reasoning or methodology underlying the [expert's] testimony is . . . valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93, 113 S.Ct. at 2796; *see also Kumho*, 526 U.S. at ——, 119 S.Ct. at 1171. In other words, the purpose of a *Daubert* hearing is to "ensur[e] that expert testimony 'both rests on a reliable foundation *and* is relevant to the task at hand.'" *Zuchowicz*, 140 F.3d at 386 (quoting *Daubert*, 509 U.S. at 597, 113 S.Ct. at 2799) (emphasis added).

■ It bears repeating that generally the admissibility of evidence must be established by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–2779, 97 L.Ed.2d 144 (1987). In the context of the admissibility of expert opinion evidence under *Daubert*, as the court reminded counsel during the hearing, "it is the proponent's burden . . . to establish admissibility, rather than the opponent's burden to establish inadmissibility." *Graham v. Playtex Products, Inc.*, 993 F.Supp. 127, 129 (N.D.N.Y.1998) (citing, *inter alia, Lust v. Merrell Dow Pharmaceuticals*, 89 F.3d 594, 598 (9th Cir.1996)). Thus, in the present case, each party had the burden of proving by a preponderance of the evidence the admissibility of the opinion testimony of their chosen expert. As discussed below, the U.S. and the State met their respective burdens, but the Tribal plaintiffs did not.

### A. Havemeyer

■ Especially because during the course of the *Daubert* hearing, all counsel had a tendency to become sidetracked in attacking a given witness' conclusions, it bears repeating that, as *Daubert* instructs, "[t]he focus . . . must be *solely* on principles and methodology, *not* on the conclusions that they generate." *Daubert*, 509 U.S. at 594, 113 S.Ct. at 2797 (emphasis added). That is so because "[i]f the principles, methodology and reasoning are . . . valid then it follows that the inferences, assertions and conclusions derived therefrom are . . . valid as well." *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) (internal quotations marks and citation omitted). Thus, in examining each of the three proffered valuation formulas, the court's focus has always been the soundness under *Daubert* of the three suggested methods—*not* on the conclusions derived therefrom.

#### 1. Reliability

With respect to the reliability factor, the *Daubert* Court outlined "specific factors, such as testing, peer review, error rates, and 'acceptability' in the relevant . . . community, some or all of which might prove helpful in determining the reliability of a particular . . . 'theory or technique.'" *Kumho*, 526 U.S. at 141, 119 S.Ct. at 1170 (citing *Daubert*, 509 U.S. at 593–94, 113 S.Ct. at 2795–2796). In keeping with the flexible nature of a court's inquiry under *Daubert*, however, the Supreme Court was equally quick to point out that this "list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* at ——, 119 S.Ct. at 1170–1171. These factors are meant "to be helpful, not definitive." *Id.* at ——, 119 S.Ct. at 1175. In fact, in *Daubert* the Court went so far as to "agree with the Solicitor General that the factors identified in *Daubert* may or *may not* be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at ——, 119

S.Ct. at 1175 (internal quotation marks and citation omitted) (emphasis added). By the same token, however, "some of *Daubert*'s questions can help to evaluate the reliability even of experience-based testimony[,]" such as the appraisal testimony at issue herein. *See id.* at ——, 119 S.Ct. at 1176.

As the Second Circuit has recognized, "[t]horny problems of admissibility arise when an expert seeks to base his opinion on novel or unorthodox techniques that have yet to stand the tests of time to prove their validity." *McCullock*, 61 F.3d at 1042. As the three appraisers uniformly testified, what they do have in common is that despite over 90 years of real estate appraisal experience among them, none has ever been confronted with an appraisal situation such as this. Thus, each of the three appraisers was required to rely upon his own training, experience, and education to devise a valuation methodology which he believed workable for this unparalleled appraisal task.

Given the novel valuation issue facing the three expert appraisers, none of the *Daubert* factors are particularly helpful in terms of ascertaining the reliability and relevancy of the proposed valuation methods. Nonetheless, the *Daubert* hearing in this case did serve its intended purpose: "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *See Kumho*, 526 U.S. at ——, 119 S.Ct. at 1176. When judged against that standard, at the close of the *Daubert* hearing, the court was forced to conclude that it had no choice but to grant the motion by the State to preclude the testimony of Mr. Havemeyer. As more fully discussed below, the court is precluding that testimony because it is not convinced that Havemeyer's proffered testimony satisfies the reliability and relevancy considerations identified in *Daubert* and elucidated in subsequent case law. By the

same token, though, because the proffered testimony of Arvel M. Hale and John D. Dorchester, Jr. does comport with the teachings of *Daubert*, the court is not precluding their testimony at the trial on damages, and hence it denied the motions *in limine* to the extent they seek to preclude the same.

### a. Methodology

Careful examination of Mr. Havemeyer's voluminous report, and consideration of his hearing testimony, compels the court to find that the reliability of his underlying data is suspect for several reasons. Furthermore, although Havemeyer invoked a recognized appraisal method, the sales comparison approach, his application of that method to the particular facts of this case was also problematic.

In the first place, although the Tribal plaintiffs claim that Mr. Havemeyer "culled representative comparable sales in accordance with established appraisal practices," the hearing evidence was to the contrary. *See* Plaintiffs' Joint Pre–Trial Memorandum at 10. Given his failure to make any adjustments, and the questionable reliability of his underlying data, as more fully discussed below, the court has serious concerns as to whether the comparison sales used by Havemeyer are truly representative, so as to properly form a basis for use of the sales comparison valuation method here. Second, despite the Tribal plaintiffs' assertion to the contrary, it is questionable whether Havemeyer and his assistants complied with "established appraisal practices" in collecting and selecting the sales data upon which Havemeyer ultimately relied upon in reaching his conclusions.

Mr. Havemeyer's sales comparison approach was done in the form of a grid analysis. For each of the 204 years at issue, he used four sales which he deemed to be representative sales for that particular year. From those sales Havemeyer then "calculated an average per acre price for each of the 204 years between 1795 and 1999." *Id.* Next, he "multiplied this aver-

age price per acre times the total number of acres in the Claim Area and [to] determine[ ] the Claim Area's market value for each year." *Id.* Lastly, Havemeyer determined the "use and occupancy" of the subject land by calculating ten percent of the market value for each year. *Id.*

Obviously, to the extent the sales data used in the first step of this process is inaccurate, it significantly impacts all subsequent calculations upon which it is based. Due to the novel valuation issues presented herein, there is no specific error rate to consider in connection with Havemeyer's analysis. However, as will be seen, because the reliability of Havemeyer's data is uncertain, the reliability of his fair market value in any given year, based upon that data, strongly suggests that his appraisal may potentially suffer from a significant rate of error. *See Zwillinger v. Garfield Slope Housing Corp.*, No. CV 94-4009(SMG), 1998 WL 623589, at *17 (E.D.N.Y.1998).

Turning specifically to the issue of the reliability of the underlying sales data, there appear to be several discrepancies between actual sales data and how it was recorded in the comparable sales sheets Havemeyer used to compile his data. To illustrate, the second sale which Havemeyer used as part of his valuation process for 1795 was a sale from Josiah Masters to John Atkinson. Havemeyer Report, Vol. I, tab 1795. In his report, Mr. Havemeyer recites that this was a sale of 250 acres. *Id.* Viewing this as a comparable sale, and without making any adjustments, Havemeyer calculated "a value to the subject [approximately 64,000 acres] of $2.50 per Acre." *Id.* As shown through the cross-examination of Mr. Havemeyer, which included an examination of the deed from Masters to Atkinson in 1795, that sale was actually for two parcels, totaling 950 acres. St. exh. 505. Thus, instead of a price per acre of $2.50, the per acre price should have been 65 cents. Transcript (Jan. 5, 2000) ("Tr.II") at 279. One need not be an expert in real estate appraisal to realize

the significance of this price difference—$160,000.00 as compared to $41,6000.00.

Then, it appears that Mr. Havemeyer improperly doublecounted in calculating fair market value for the years 1988–89. During those years he separately valued lake front property. Yet, in calculating the fair market value for that ten year period, he failed to deduct lake frontage from the overall acreage. As a result, it seems that at a minimum for the years 1988–1999 Mr. Havemeyer overestimated the fair market by roughly $550,000.00.

Another aspect of Havemeyer's analysis which concerns the court is regardless of whether he followed "established appraisal practices," it appears that he did not even follow his own procedures. Again, to illustrate, even though Havemeyer explained that in selecting representative sales, he "typically" discarded the high and low sales, he admitted to not having done that for 1945. *Id.* 283–84. Further, Mr. Havemeyer also conceded that he did not eliminate the highest sale in the 1950s. *Id.* at 292. Havemeyer attempted to justify his failure to discard the high sale for 1945 by explaining that in selecting representative sales, he did not act "in a vacuum." *Id.* at 287 and 291. Rather, Havemeyer explained that he "had a feeling of the values" from all of the sales he reviewed. *Id.* at 287.

Indeed, Havemeyer repeatedly testified to having used what the court will refer to as an intuitive approach in selecting comparable sales. For example, Mr. Havemeyer freely admitted that for each given year, he selected by "feel" the four sales which he used in his analysis, opining that "[t]his is where the art of appraisal comes in[.]" Transcript (Jan. 4, 2000) ("Tr.I") at 122. While that may be true, Havemeyer was unable to articulate with any degree of specificity the basis for his comparable sales selection. This inability made it next to impossible for the court to ascertain with any degree of confidence the reliability of Havemeyer's method—both in terms

of the underlying data and in terms of its application.

In this respect, Havemeyer's testimony as to how he selected the comparable sales is not unlike the testimony of the tire failure analyst in *Kumho*, testimony which the Supreme Court found the district court properly excluded. There, rather then answering with specific information a question as to his methodology, the expert in *Kumho*, as did Mr. Havemeyer, repeatedly relied on the " 'subjective[ness]' of his mode of analysis[.]" *See Kumho*, 526 U.S. at ——, 119 S.Ct. at 1177. The court is not saying that subjective analysis has no place in the valuation task which these appraisers were facing. Indeed, at least from what the court was able to glean from the hearing testimony of Hale and Dorchester, they too, necessarily, relied upon a certain amount of subjectivity, particularly with respect to deriving fair market value for pre–1900 sales. One primary difference, though, between the testimony of Hale and Dorchester, and that of Havemeyer, is that the latter continually relied upon little more than his subjective "feeling," especially in terms of selecting sales to be used in arriving at a fair market value for any given year. Hale and Dorchester, on the other hand, both have significant, reliable objective data, from which they then relied upon to extrapolate their conclusions.

Moreover, the sales data upon which Mr. Havemeyer did rely was not always accurately reported. Obviously a monumental task such as this could not be done by one person. Mr. Havemeyer employed several researchers to assist him in data collection and compilation. Apparently Mr. Havemeyer did not have in place adequate checks and controls on the reliability of the data collected by his assistants, however, because, for example, in his 1988 Cayuga County sales grid, the sale designated "L–4," the stated sales price is $41,500. *See*

Havemeyer Rpt., Vol. II, at tab 1988. On cross-examination Havemeyer was forced to concede, however, that that price was "probably [taken] off the deed incorrectly[,]" given that the deed itself, as well as the Real Property Transfer Report[5] for that sale, "would lead [one] to conclude that the [sale] price was $135,000." Tr. II at 362; *see also id.* at 361.

This is not the only error in Havemeyer's recorded data. There is proof of other such mistakes, albeit inadvertent, such as not always ensuring that a given sale was, in fact, an arm's length transaction. As Mr. Havemeyer himself testified, as well as the other two appraisers, in ascertaining fair market value it is important to know whether a given transaction was at arm's length or not, because if it was not, then it is not a reliable indicator of fair market value. There is evidence in the record that Mr. Havemeyer and/or his assistants did not always verify arm's length transaction status.

The foregoing examples are only illustrations of deficiencies in Havemeyer's data. By no means, though, does this brief discussion catalog all of the reporting inaccuracies which appear to have occurred in Havemeyer's appraisal process. These inaccuracies, especially when taken together, seriously call into question the factual underpinnings of his appraisal.

To compound matters, although Havemeyer purported to use a sales comparison approach, and although in his grids he recognized the possibility of various adjustments, such as location, topography, date of sale, and conditions of sale, in the end he made no adjustments whatsoever. *See generally* Havemeyer Rpt., Vols. I and II. Havemeyer made no adjustments, even for size, which he acknowledged is an important consideration when using the sales comparison approach. Tr. I at 95. He did not make that adjustment even though he relied upon sales ranging from as small as

---

**5.** These reports are commonly referred to in the appraisal field by their form number 5217. Such forms are variously prepared by

sellers, purchasers or attorneys for either and filed with the county clerk's office when a sale is recorded.

one acre to a sale as large as 950 acres, and even though he was using such sales to value what he termed "a fairly large land mass," i.e. roughly 64,000 acres. *Id.* This failure to adjust for size is magnified by the fact that, as all three appraisers agreed, it is generally accepted in the appraisal field that smaller parcels of land will sell for a higher unit price than larger parcels. Therefore, not adjusting for size arguably resulted in inaccurate inflation of Havemeyer's overall figures.

Havemeyer's failure to make any size adjustment is not the only questionable aspect of his application of the sales comparison approach here. To determine rental value, Mr. Havemeyer selected a discount rate of ten percent. *See* Havemeyer Rpt., Vol. I at 65. In his report, Havemeyer devoted a scant two paragraphs to the discount rate issue, providing no insight as to the basis for his use of that rate to determine rental value. *Id.* As was brought out during cross-examination, evidently Havemeyer used this discount rate based upon his incorrect assumption that that was the rate used in what is commonly referred to as the *Oneida* test case, *Oneida Indian Nation of New York v. Counties of Oneida and Madison,* 70–CV–35. Actually, because there the parcel was being valued as one property, and because approximately 90% of it was deemed to be "agricultural-recreational in nature," thus having a typical rent level ranging from one percent to three percent annually, the appraiser there used 3.5% in calculating the annual net rent. St. exh. 508 at 2. In light of the foregoing, even taking into account Mr. Havemeyer's many years of appraisal experience, in the court's opinion, his use of a ten percent discount rate, with no stated, reliable basis for the same, amounts to nothing more than speculation and conjecture that such a rate would be appropriate here. As such, even otherwise assuming the reliability of Havemeyer's report and his testimony based thereon, this aspect pertaining to the applicable discount rate would have to

be excluded. *See Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996).

In terms of how he arrived at the fair market value per year, the court also finds disturbing the fact that Havemeyer looked not only at sales preceding the valuation date by five years, but that he also looked to sales three to four years *after* the valuation date under consideration. Based upon the proof adduced during the *Daubert* hearing, there is no dispute that in the appraisal field, to determine fair market value, it is proper to use sales preceding the valuation date. The rationale for this practice is that in determining fair market value, the focus is on what a willing buyer and a willing seller would pay for a given piece of property on a given date. Part of making that determination is taking into account what those parties knew, or could reasonably have known at the time, about market conditions. Obviously, sales which post-date the subject sale are not known or even knowable to the parties at the time of sale, and hence cannot be taken into account by them in determining sales price.

For all of these reasons, although the court certainly does not dispute Mr. Havemeyer's credentials as an appraiser, it finds that his testimony here is not reliable in that "[i]t [falls] outside the range where experts might reasonably differ[.]" *See Kumho,* 526 U.S. at ——, 119 S.Ct. at 1177 (citing *Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798). Similarly, in contrast to the testimony of Hale and Dorchester, Havemeyer's testimony falls "outside the range ... where the jury must decide among the conflicting views of different experts, even though the evidence is 'shaky.'" *Id.* (quoting *Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798). In short, the court finds that Mr. Havemeyer's testimony is simply not reliable in the manner which *Daubert* and its progeny require.

### 2. Relevancy

Relevancy, the second *Daubert* factor, has "also be[en] described as ensuring that the evidence 'fits' the facts of the case[.]"

*Zwillinger,* 1998 WL 623589, at \*10 (citing *Daubert,* 509 U.S. at 591, 113 S.Ct. at 2796). This "means that the expert's opinion must relate to an issue that is actually in dispute and must provide a valid … connection to the pertinent inquiry.'" *Graham,* 993 F.Supp. at 130 (quoting Margaret A. Berger, *Procedural Paradigms for Applying the Daubert Test,* 78 Minn. L.Rev. 1345, 1351 (1994)).

Primarily for the reasons discussed in the preceding section, the court finds that Havemeyer's testimony will not be helpful to the jury in understanding or determining how the subject property should be valued. The court stresses that it is rejecting Havemeyer's proffered valuation testimony, not because of the conclusions which he reaches,[6] but because of the manner in which he applied his chosen methodology—the sales comparison approach—and the questionable reliability of his underlying sales data. And while it is true that "conclusions and methodologies are not entirely distinct[,]" given that "[t]rained experts commonly extrapolate from existing data[,] … nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* That is precisely the situation here. Just because Mr. Havemeyer testified that his appraisal was "absolutely" MAI[7] quality does not make it so. *See* Tr. II at 382.

Before concluding its discussion of Havemeyer's testimony, the court notes that he freely admitted that he "did [not] do a complete analysis of each sale[,]" due to time and budget constraints. *Id.* at 341. While the court is sympathetic to these constraints, the fact remains that the other appraisers were operating under similar constraints; but that did not prevent them from developing formulas and presenting data which the court deems reliable for purposes of *Daubert.*

Standing alone, any one of the deficiencies outlined in this section probably would not cause the court to question the reliability of either Mr. Havemeyer's data, or his method of applying the same to the present case. The cumulative effect of the foregoing, and considering Mr. Havemeyer's testimony and report as a whole, lead the court to conclude, however, that his "analysis rests on faulty assumptions," and thus it is lacking in probative value. *See, e.g., Raskin v. Wyatt Co.,* 125 F.3d 55, 67–68 (2d Cir.1997). In addition, particularly because the court is not persuaded that the manner in which Havemeyer applied the sales comparison approach is reliable, the court finds that his fair market value analysis resulted in an "apples and oranges comparison," thus mandating exclusion of his testimony. *See Boucher,* 73 F.3d at 21. Furthermore, for the reasons set forth herein, the court is not convinced that Havemeyer's testimony bears sufficient indicia of reliability to render it admissible. In sum, because Havemeyer's testimony as to property valuation is neither reliable nor relevant, it has no place in the upcoming trial as to damages.

### 3. Hale and Dorchester

The valuation issues which this case presents are issues of first impression. That does not mean, however, that the testimony of Messrs. Hale and Dor-

---

6. Similarly, the court is not allowing the testimony of Hale and Dorchester based upon the conclusions which they have reached—conclusions which are diametrically opposed—but it is allowing their testimony because it is satisfied that the same is both reliable and relevant here.

7. The Appraisal Institute, a national organization of appraisers, confers MAI status on appraisers who have completed a series of examinations, including a comprehensive examination; have completed, and subjected to peer review, certain "demonstration appraisals;" and have at least five years appraisal experience. *See* Tr. I at 60.

328

chester, who both freely admitted to developing their respective valuation methodologies for first-time use in this case, should be precluded from testifying. The court finds no basis for precluding the suggested appraisal methods of either Hale or Dorchester because, in its opinion, at least at this juncture, both methodologies are reliable and relevant. In this regard, despite what the State often implied during its cross-examination of Havemeyer and Hale, the grounds for the experts' opinions do not have to be perfect; they "merely have to be good[.]" *See Graham,* 993 F.Supp. at 133 (quoting *In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717, 744 (3rd Cir.1994)). Thus, even if perhaps there are some flaws in the methodologies proffered by Hale or Dorchester, or both, that alone does not render inadmissible their opinions. Having found that the testimony of these two appraisers is both reliable and relevant, the court notes, as did the Supreme Court in *Daubert,* that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of challenging the testimony of Hale and Dorchester.

After listening to the testimony of Hale and Dorchester, and after carefully reviewing each of their reports, the court is satisfied that their respective methodologies rest on a reliable foundation and will assist the jury in deciding the property valuation issue which is now at the heart of this lawsuit. Simply put, in exercising its function as gatekeeper, because the court has determined that the proffered opinions of both Hale and Dorchester pass muster under *Daubert,* it is "for the jury to decide which, if either, expert witnesses' testimony it [chooses] to accept." *See Trumps v. Toastmaster, Inc.* 969 F.Supp. 247, 253 n. 7 (S.D.N.Y.1997).

For the reasons set forth herein, as the court indicated at the close of the *Daubert* hearing, it grants the State of New York's motion to preclude the testimony of John F. Havemeyer, III; but it denies the

State's motion to preclude the testimony of Arvel M. Hale, and likewise, it denies the motions by the Tribal plaintiffs and the United States to preclude the testimony of John D. Dorchester, Jr.

IT IS SO ORDERED.

