**Cleant HILAIRE, Plaintiff,**

v.

**DEWALT INDUSTRIAL TOOL CO., Defendant.**

**No. 10 CV 5071(ILG).**

United States District Court, E.D. New York.

Signed Oct. 8, 2014.

---

Pat J. Crispi, Keogh Crispi P.C., New York, NY, for Plaintiff.

Michael Kim Berman, Michael K. Berman, Smith Mazure Director Wilkins Young & Yagerman, P.C., New York, NY, for Defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Pending before the Court are objections to an extensive Report by Magistrate Pollak and her Recommendation (R & R), which that Report essentially compelled that the defendant's motion for summary judgment and to preclude the testimony of the plaintiff's proposed liability expert be granted.

The event that gave rise to this action is the severance of a portion of the plaintiff's left hand while he was attempting to cut wood using a table saw manufactured by the defendant. He alleges that the table saw was defectively designed and did not contain adequate warnings and that his serious injuries were caused entirely by the negligence of the defendant.

Sought to be excluded is the testimony of one "liability expert" proposed to be offered by the plaintiff who will opine that the saw was defectively designed and that warnings of potential danger inherent in its use were inadequate.

In a motion to preclude an expert from testifying, a court plays the role of a gatekeeper—determining whether he should be permitted to pass through the testimo-

nial gate or whether that gate should remain closed to him. In making that determination, the court is guided by two seminal cases, *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); and *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The rest (thousands of cases which followed in their wake), is commentary. Those cases teach that the discharge of the gatekeeping responsibility requires an answer to two questions: (1) is the proposed expert qualified to testify by virtue of his specialized "knowledge, skill, experience, training or education?" Fed. R. Ev. 702; and (2) if deemed qualified, is his testimony reliable and will it assist the fact finder in deciding the issue? Both questions must be answered in the affirmative if the testimonial gate is to be opened. Magistrate Judge (MJ) Pollak's 48 page R & R is a virtual monograph on the law governing that determination in all of its nuances.

The facts to which the law was to be applied were meticulously distilled from the report of the testimony the proposed expert, Mr. Lewis Barbe, would give and from his deposition. A summary of the expert's qualifications gleaned from his resumé is as follows:

He has a Bachelor of Science degree from the Illinois Institute of Technology in Fire Protection and Safety Engineering. He has consulted as a "licensed safety engineer" for more than 35 years. He is registered and "certified" as a safety engineer in several states and by a number of Boards identified as C.S.P., C.P.S.M., C.H.C.M., H.S.P. with little or no information as to the qualifications for membership in or function of them. He is employed by 3 companies as a "Risk Manager" in one, and a "Safety Engineer" in another. Whether he has responsibility for designing products or for assessing products for safety and performance is unclear. His resumé reflects that he has taught safety engineering and compiled a reference manual for OSHA. He could remember only one article he wrote that was published. He is a "participating member" in various professional organizations that develop safety standards for various products and industries. He stated that he is applying for a patent on a safety device to be used on table saws and portable table saws, but for reasons of confidentiality refrained from discussing its details.

He testified on deposition that he testified at approximately 100 trials, was deposed approximately 400–500 times and was unable to recall any case in which he testified for a defendant. He has no training or experience in designing table saws. He has neither lectured on nor taught courses on the design or manufacture of table saws. He never owned a table saw, only used one within the last 2 years, and never worked as a carpenter. His report concluding negligence in design and manufacture given the many safety devices and safety technology available but not used on the offending saw is confidently asserted despite his admission that he never saw a marketed table saw equipped with the safety devices and the technology he describes; nor has he ever designed table saws incorporating those safety devices. His qualifications as discerned from his resumé and deposition testimony that has any relevance to the issue in this case is extensively discussed in the R & R at pages 231–33 and 235–42. In the light of that discussion the MJ's recommendation, albeit made reluctantly, that he is "barely" qualified to testify, is magnanimously charitable.

The balance of the R & R, pages 242–53, can only be described as an incisive, logical

analysis of the proposed expert's qualifications which compels the conclusion that they are patently inflated and that his proposed testimony is based on facts, methods and principles which are insufficient and unreliable and which will provide no meaningful help to "the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Ev. 702(a)-(c).

The R & R is, accordingly, adopted in its entirely.

SO ORDERED.

## *REPORT AND RECOMMENDATION*

CHERYL L. POLLAK, United States Magistrate Judge.

On November 3, 2010, the above captioned case was removed to the Eastern District of New York from the Supreme Court of the State of New York, Queens County. In this case, plaintiff Cleant Hilaire seeks damages for personal injuries that he allegedly sustained on August 24, 2007, while operating a DW745 Heavy Duty 10″ Job Site Table Saw, bearing serial number 2006 46–CT 041971 (hereinafter, the "Saw"), during the course of his employment with Harper Design Build, Inc. (Compl.[1] ¶¶ 2, 9, 10 13).

By Notice of Motion dated February 21, 2014, defendant DeWalt Industrial Tool Co. (hereinafter, "Black & Decker")[2] moves for summary judgment, pursuant to Federal Rule of Civil Procedure 56, and seeks to preclude the testimony of plaintiff's proposed liability expert, Lewis C. Barbe, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). (*See* Def.'s Mem. at 1, 3).

■ On referral from the district court,[3] the undersigned held a *Daubert* hearing on May 7, 2014,[4] and submits this Report and

---

1. Citations to "Compl." refer to plaintiff's Verified Complaint, dated August 17, 2010, and attached as Exhibit A to plaintiff's Notice of Motion for Summary Judgment, filed on February 21, 2014.

2. According to defendant, Black & Decker (U.S.) Inc. was improperly named as "DeWalt Industrial Tool Co." in the Complaint, (Defendant's Verified Answer, dated October 25, 2010 ("Ans.") at 1; Defendant's Memorandum of Law in Support of Motion to Exclude Expert Testimony of Lewis Barbe and Summary Judgment Pursuant to FRCP 56 ("Def.'s Mem.") at 1, n. 1). Defendant explains that "DeWalt Industrial Tool Co. is not a corporation, but is a trade named used by [Black & Decker] in the design and manufacture of certain products." (*Id.*)

3. In the Eastern District of New York, magistrate judges are generally empowered to act with respect to non-dispositive pretrial matters, such as motions to exclude expert testimony under Federal Rule of Evidence 702 and *Daubert*. *See* E.D.N.Y. Local Civ. R. 72.2. However, in this case, plaintiff claims that the Saw at issue was defectively designed (*see* Compl. ¶ 12), and under New York law, a claim for defective design cannot proceed without expert testimony. *See Cuntan v. Hitachi KOKI USA, Ltd.*, No. 06 CV 3898, 2009 WL 3334364, at *6 (E.D.N.Y. Oct. 15, 2009); *see also Rypkema v. Time Mfg. Co.*, 263 F.Supp.2d 687, 692 (S.D.N.Y.2003) (explaining that plaintiffs can meet their burden of showing a feasible alternative design by introducing expert testimony that the alternative is reasonably practical or already in use by other manufacturers). Thus, defendant's *Daubert* motion is potentially dispositive, given that a ruling precluding plaintiff's only liability expert witness would likely require dismissal of plaintiff's claim. (*See* discussion *infra* at 252).

4. Plaintiff's counsel chose not to present his expert's testimony at the May 7, 2014 *Daubert* hearing, electing instead to rely on the expert's report, deposition testimony, and the papers submitted by the parties. *See, e.g., Faryniarz v. Nike*, No. 00 CV 2623, 2002 WL 1968351, at *4 (S.D.N.Y. Aug. 23, 2002) (holding that it is not necessary to hold a *Daubert* hearing "for every motion to exclude testimony under Rule 702"); *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F.Supp.2d 53,

Recommendation, respectfully recommending that defendant's motion to preclude the proposed expert testimony of Mr. Barbe be **granted** and that defendant's Motion for Summary Judgment be **granted** in its entirety.

### *FACTUAL BACKGROUND*[5]

#### A. *The Accident*

On August 24, 2007, plaintiff was attempting to cut a section of cabinet wood, using the DeWalt DW745 Heavy–Duty 10″ Job Site Table Saw, bearing serial number 2006 46–CT 041971, when a portion of his left hand was severed by the Saw's blade. (Compl. ¶ 10; Def.'s Mem. at 1–2). At the time of the incident, plaintiff was employed by Harper Design Build, Inc. ("Harper") as a carpenter and he was working with the Saw at a construction site, located at 381 11th Street in Brooklyn, New York. (Compl. ¶¶ 8, 9). According to plaintiff, Harper had previously acquired the Saw through an authorized Black & Decker dealer. (*Id.* ¶ 6).

The Saw is a "portable light weight jobsite table saw," manufactured in November 2006. (Def's. Mem. at 3–4 (citing Schafebook Dep.[6] at 24–26; Def's Ex. E[7])). According to defendant, the Saw is designed to allow an operator to make a variety of cuts, including rip cuts, cross cuts, angled cuts, and non-through cuts. (*Id.* at 4). Defendant asserts that the Saw was designed in conformity with industry standards and includes a variety of safety features as standard equipment, including a splitter-mounted blade guard assembly, which is designed to reduce the risk that the operator will come into contact with the blade while using the Saw. (*Id.* (citing Schafebook Dep. at 54–55)). The Saw also includes warnings on the Saw itself and in the instruction manual. (*Id.* at 5 (citing Def.'s Mem. Exs. E, H)). The warnings advise the user to always use the blade guard during cutting operations. (*Id.* at 5). However, defendant acknowledges that certain cuts, such as non-through cuts, cannot be performed while the guard is in place. (*Id.*)

According to plaintiff, he is a high school graduate, with seven years of carpentry and heavy construction experience prior to the accident. (Pl.'s Dep.[8] at 9, 31–33).

71 (S.D.N.Y.2001) (noting that "[n]othing in *Daubert,* or any other Supreme Court or Second Circuit case, mandates that the district court hold a *Daubert* hearing before ruling on the admissibility of expert testimony, even where such ruling is dispositive of a summary judgment motion"); *see also Oddi v. Ford Motor Co.,* 234 F.3d 136, 154–55 (3d Cir. 2000) (finding no hearing was required where the court had reviewed the depositions, a declaration, and an expert report). As the court in *Humphrey v. Diamant Boart, Inc.,* noted, while "a Rule 104(a) pretrial evidentiary hearing is often necessary to address *Daubert* issues, such hearings are unnecessary if the objections to the testimony being raised do not turn on factual issues and, thus, can be decided on the written submissions and evidence." 556 F.Supp.2d 167, 173 n. 3 (E.D.N.Y.2008). In that case, as here, neither party requested the opportunity to take testimony, and the objections dealing with the expert's qualifications and methodology raised legal arguments on undisputed facts. *Id.*

5. Unless otherwise noted, the facts in this section are assumed to be true for the purposes of this motion only.

6. Citations to "Schafebook Dep." refer to the Deposition transcript of Richard Schafebook, dated October 11, 2012, attached as Exhibit D to Defendant's Memorandum of Law in Support of its Motion for Summary Judgment.

7. Citations to Def.'s Ex. E refer to photographs of the DW745 table saw attached to Defendant's Memorandum of Law in Support of its Motion for Summary Judgment as Exhibit E.

8. Citations to "Pl.'s Dep." refer to the Deposition transcript of Cleant Hilaire, dated Sep-

Plaintiff testified that he had used table saws "hundreds of times" and knew that the blade guard was used to help prevent a person's hands from coming into contact with the blade. (*Id.* at 62–65, 67, 75–77, 95). Plaintiff also testified that when he started working for Harper, he noted that the Saw did not have the blade guard assembly in place and he was concerned about its absence. (*Id.* at 94–97). He read the warning labels on the Saw and in particular, read the label that stated: "Danger! Keep hands away from the blade." (*Id.* at 129–130; Def.'s Ex. E).

On the date of the accident, plaintiff was using the Saw, which had been placed in a makeshift table, set on top of a cabinet. (*Id.* at 100–103, 126). As plaintiff was in the process of performing a rip cut, using a push stick to push the wood into the Saw blade, the wood got stuck on a lip between the table saw top and the table. (*Id.* at 115). Without turning off the Saw, plaintiff reached his left hand over the blade to get the wood, while continuing to push the push stick with his other hand. (*Id.* at 115–119). The force of the blade caused the wood to "kick back" and the blade pulled plaintiff's left hand into the Saw. (*Id.*) Defendant contends that it is undisputed that the type of cut being performed by plaintiff could have been done with the guard assembly in place, and had the blade guard been in place, the accident would not have occurred. (Def.'s Mem. at 9 (citing Schafebook Dep. at 94–95; Barbe Tr.[9] at 179, 245–246)).

In his Complaint, plaintiff appears to allege that the product was defectively designed and did not contain adequate warn-

ings. (*See* Compl. ¶ 12 (alleging that defendant "was careless and negligent in the design, testing, inspection, manufacture, distribution, labeling, sale and promotion of the [Saw]")). Plaintiff alleges that he sustained "serious personal injuries" "solely due to the negligence of defendant." (Compl. ¶¶ 11, 13). Plaintiff alleges that as a result of this incident, he has incurred various medical expenses and is no longer able to engage in his usual occupation. (*Id.* ¶¶ 13, 14). Plaintiff also claims that defendant Black & Decker is liable under theories of strict liability and breach of warranty. (*Id.* ¶¶ 17–21).

### B. The Expert Opinion of Lewis C. Barbe

To establish his claim that the accident was caused by a design defect, plaintiff seeks to offer the testimony of a single liability expert, Mr. Lewis Barbe, who claims that the Saw has a design defect (Barbe Rep.[10] at 13), and inadequate warnings. (Barbe Tr. at 165–66). In his expert report, dated June 11, 2013, Mr. Barbe states that "[t]he Saw was defective at the time of sale, due to the lack of proper interlocks, safety guards/proper guarding," and that "the unsafe acts and unsafe conditions created by" Black & Decker are the only cause of plaintiff's injury. (*Id.*) Mr. Barbe contends that "a proper permanent guard or other design" would have prevented plaintiff's injury and that plaintiff "did not misuse or abuse the saw." (*Id.* at 14). He further states that "the Saw lacked a proper guard necessary to prevent injury" and "[t]he unsafe conditions . . . of the Saw [thus] violated the common-

---

tember 7, 2011, attached to Defendant's Memorandum of Law in Support of its Motion for Summary Judgment as Exhibit I.

9. Citations to "Barbe Tr." refer to the Transcript of the Deposition of Mr. Lewis Barbe on August 28, 2013 at 9:06 a.m.

10. Citations to "Barbe Rep." refer to the Expert Report of Mr. Lewis C. Barbe, dated June 11, 2013, which is attached to the Declaration in Opposition of Pat James Crispi, dated March 31, 2013 ("Crispi Dec.").

ly accepted rules, recommended practices and well-known safety standards within the industry." (*Id.* at 15).

During his deposition, held on August 28, 2013, Mr. Barbe explained that, based on accepted industry standards, the removable "barrier" accompanying the Saw did not constitute a "guard," given that the Saw became "inherently unsafe when the barrier that was put on it [was] taken off." (Barbe Tr. at 20–21, 27). According to Mr. Barbe, data from the Consumer Protection Safety Commission ("CPSC") indicates that table saws are responsible for approximately ten finger amputations each day (Barbe Rep. at 14; Barbe Tr. at 27–28), and therefore, "something is [inherently] wrong with the machine." . (Barbe Tr. at 28).

Mr. Barbe postulates that "an alternative design . . . was available when the Saw was designed, manufactured and sold," and he suggests several alternative designs. (Barbe Rep. at 14). For example, Mr. Barbe suggests that "a trap saw[ ] . . . would eliminate the hazard of an unguarded table saw." (*Id.* at 16). He explains that a trap saw[11] "has its blade covered when it is in motion either by a guard from above or a well below the table." (*Id.* at 16; *see also* Barbe Tr. at 58–59) (explaining that a trap saw is a commercially available device, in the shape of a half moon, that prevents a saw operator from coming into contact with the

blade). During his deposition, Mr. Barbe explained that a trap saw is not a mechanism that could be added to the Saw's design; it is an entirely separate product. (Barbe Tr. at 63). A trap saw is designed so that the blade "moves through the work piece, the work piece does not move through the blade;" that is, the operator of the saw places the wood to be cut on the device and then pushes a button, which causes the blade to move and cut the wood. (*Id.* at 59–60). He maintains, however, that a trap saw is designed to perform the same function as the table saw at issue in this case. (*Id.* at 63).

Mr. Barbe also suggests that "flesh-detection technology" (commonly referred to as "SawStop") could have been used; such technology allows "table saws to detect flesh and stop blades before they can cut into it."[12] (Barbe Rep. at 14; *see also* Barbe Tr. at 88 (stating that the Saw was defective given that SawStop technology was available but not used)).[13]

Further, Mr. Barbe contends that interlocks and safety barriers are known and accepted mechanisms used in the industry to prevent body parts from coming into contact with a table saw blade. (Barbe Rep. at 15; Barbe Tr. at 49, 52). According to Mr. Barbe, an interlock can be designed so that when such a protective device is removed from the Saw, "it shuts off the electricity of the machine." (Barbe Tr. at 50). He asserts that "[t]he state of

---

11. Mr. Barbe also refers to a "trap guard" in his report (*see* Barbe Rep. at 14 (suggesting a "trap guard" was a feasible alternative design that was available when the Saw was manufactured)) and in his deposition (Barbe Tr. at 82 (putting forth a "trap guard or using a different type of saw completely" as alternative designs)). However, he does not explain in either his report or deposition what a trap guard is or whether it is different from a trap saw.

12. Mr. Barbe acknowledges that while the inventor of this technology, along with certain consumer advocates, has pushed for a federal rule mandating the use of SawStop on all table saws, no such regulation has ever been adopted. (Barbe Rep. at 14).

13. The Court notes that during Mr. Barbe's deposition, he declined at least six times to say that the Saw was defective because it did not incorporate SawStop technology, before suggesting that this in fact constituted a defect (*See* Barbe. Tr. at 82–88).

the art of the industry, together with reasonable care, would have required the Saw's vendors and designer to recall or implement a retrofit program to warn and correct the unsafe conditions" caused by the absence of these types of safety features. (Barbe Rep. at 15).

In addition to claiming that the Saw is defectively designed, Mr. Barbe asserts that the safety warning on the Saw does not meet standards promulgated by ANSI,[14] due to the fact that the word "warning" was used, as opposed to the word "danger." (*See* Barbe Tr. at 165–66). Mr. Barbe also suggests that the warning label should have alerted consumers to the frequency with which the Saw "cuts off hands and body parts." (*Id.* at 175–76, 178). Further, Mr. Barbe asserts that the Saw lacks any instruction or warning that explains the way in which removal of the blade guard can result in a condition known as "kickback."[15] (*Id.* at 179).[16]

Defendant challenges both Mr. Barbe's qualifications and expert conclusions, seeking to preclude his testimony in its entirety. Defendant contends that Mr. Barbe "does not have the necessary expertise in mechanical engineering, electrical engineering, and the design of portable table saws to render expert opinions" about them. (Def.'s Mem. at 10). Moreover, defendant asserts that Mr. Barbe's opinions

"are exactly the type of opinions meant to be excluded by Rule 702 and by the Supreme Court in *Daubert* as unreliable and irrelevant." (*Id.*) In response, plaintiff claims that Mr. Barbe is qualified to render an expert opinion in this matter, that his opinions rest on facts and data, and that the principles and methods he used to reach his conclusions are reliable. (Pl.'s Mem.[17] at 3).

## DISCUSSION

I. *Admissibility of an Expert's Opinion Under Daubert*

A. *Federal Rule of Evidence 702*

The standards governing the admissibility of expert testimony are set forth in Rule 702 of the Federal Rules of Evidence, and are further clarified by *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. Under Rule 702, "[a] witness ... qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if ... the expert's scientific,

---

**14.** ANSI refers to the American National Standards Institute. According to ANSI's website, "[t]he Institute oversees the creation, promulgation and use of thousands of norms and guidelines that directly impact businesses in nearly every sector" of the economy. American National Standards Institute, http://www.ansi.org/about_ansi/overview/overview.aspx?menuid=1 (last visited May 13, 2013).

**15.** According to defendant, a "kickback" is "a phenomenon where wood is propelled by the blade back towards the operator." (Def.'s Mem. at 1 n. 2).

**16.** Photographs of the Saw show that it bore a number of warning labels. Some used the signal "warning" and some used the signal "danger." (Def.'s Mem. Ex. E). Further, two of the labels specifically warned of the danger of kickbacks. One said "to prevent kickback, use the blade guard and splitter for all through sawing." (*Id.*) The other said "know how to reduce the risk of kickbacks." (*Id.*)

**17.** Citations to "Pl.'s Mem." refer to plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Preclude The Testimony of Plaintiff's Expert And For Summary Judgment, filed on March 31, 2014.

technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. The text of Rule 702 makes it clear that there are two prerequisites that must be met before the testimony of an expert witness can be admitted into evidence. First, the trial court must ensure that the witness is properly qualified as an expert to testify on matters that are scientific, technical, or specialized in nature, *see Hodder v. United States,* 328 F.Supp.2d 335, 345 (E.D.N.Y.2004) (citing *Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 81 (2d Cir.1997)); and second, the trial court must determine that the expert's testimony will assist the trier of fact in understanding the evidence or determining an issue of fact. *See Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.,* 239 F.3d 179, 184 (2d Cir.2001) (noting that determining whether expert testimony will assist the fact finder " 'entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue' ") (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. at 592–93, 113 S.Ct. 2786); *TC Sys. Inc. v. Town of Colonie, N.Y.,* 213 F.Supp.2d 171, 176 (N.D.N.Y. 2002) (citing *United States v. 31–33 York Street,* 930 F.2d 139, 141 (2d Cir.1991) (excluding expert testimony that would only complicate, not assist, the jury's decision on "a simple question for which the jury needed no help")).

■ In other words, the trial court functions as a "gatekeeper" and must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm.,* 509 U.S. at 597, 113 S.Ct. 2786 (explaining that district courts play a gatekeeping function in determining whether the testimony of an expert should be excluded); *see also Lidle ex rel. Lidle v. Cirrus Design Corp.,* No. 08 CV 1253, 2010 WL 2674584, at *2–3 (S.D.N.Y. July 6, 2010); *Gould Paper Corp. v. Boise Cascade Corp.,* No. 95 CV 9771, 2000 WL 1099941, at *1 (S.D.N.Y. July 10, 2000). Moreover, the trial court's gatekeeping obligation, "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. at 141, 147, 149–50, 119 S.Ct. 1167 (finding *Daubert* applies to the admissibility of an engineering expert's testimony and noting that "[e]ngineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases" and "there are many different kinds of experts, and many different kinds of expertise" to which the *Daubert* analysis applies); *see also Cayuga Indian Nation of N.Y. v. Pataki,* 83 F.Supp.2d 318, 321 (N.D.N.Y. 2000) (determining that witnesses were qualified as experts based on their experience as real estate appraisers, as demonstrated by their respective *curriculum vitae* and testimony).

■ The question of admissibility of expert testimony is for the trial judge to resolve and the court has "broad discretion" in making that determination. *United States v. Feliciano,* 223 F.3d 102, 120 (2d Cir.2000); *Palazzetti Import/Export, Inc. v. Morson,* No. 98 CV 722, 2001 WL 793322, at *2 (S.D.N.Y. July 13, 2001).

## B. Standards Under Daubert & Kumho Tire

■ The standard governing the admissibility of expert testimony is liberal and flexible. *Houlihan v. Marriott Int'l, Inc.,* No. 00 CV 7439, 2003 WL 22271206, at *3 (S.D.N.Y. Sept. 30, 2003) (citation omitted); *see Krause v. CSX Transp.,* 984 F.Supp.2d

62, 73–74 (N.D.N.Y.2013) (explaining that to assess "whether a proposed expert is 'qualified,' the trial judge should remember the liberal purpose of Fed.R.Evid. 702, and remain flexibl[e] in evaluating the proposed expert's qualifications") (internal quotations and citations omitted). The Second Circuit has held that under the Federal Rules of Evidence, there is a general "presumption of admissibility of evidence," *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir.1995), and indeed, the "rejection of expert testimony is 'the exception rather than the rule.'" Fed.R.Evid. 702 advisory committee's note; *see also Melini v. 71st Lexington Corp.*, No. 07 CV 701, 2009 WL 413608, at *5 (S.D.N.Y. Feb. 13, 2009) (internal quotations and citations omitted).

### C. *Qualification as an Expert*

The trial court's first step is to determine whether the proffered expert is qualified by virtue of some specialized "'knowledge, skill, experience, training or education.'" *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir.1998) (quoting Fed.R.Evid. 702). Although *Daubert* itself addressed scientific testimony, "any such knowledge might become the subject of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. at 147, 119 S.Ct. 1167; *see also McCullock v. H.B. Fuller Co.*, 981 F.2d 656, 657 (2d Cir.1992) (holding that proposed expert who lacked relevant training and experience was not qualified to testify as to the adequacy of a warning label); *Cayuga Indian Nation of N.Y. v. Pataki*, 83 F.Supp.2d at 321.

 Moreover, while the threshold issue of whether a particular witness qualifies as an expert is one for the judge to determine, it is for the jury to decide what weight should be given to the testimony. *See Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir.1990); *TC Systems Inc. v.*

*Town of Colonie, New York*, 213 F.Supp.2d 171, 175 (N.D.N.Y.2002) (citing *Valentin v. New York City*, 94 CV 3911, 1997 WL 33323099, at *15 (E.D.N.Y. Sept. 9, 1997)). Once the testimony has been found to be admissible, the adverse party is free to challenge any "shaky or unreliable" testimony before the jury using the "traditional' devices of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *In re Joint Eastern & Southern Dist. Asbestos Litig.*, 52 F.3d 1124, 1132 (2d Cir.1995) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. at 596, 113 S.Ct. 2786); *see also Jarvis v. Ford Motor Co.*, 283 F.3d 33, 48 (2d Cir.2002) (holding that disputes over the conclusions to be drawn from the expert's analysis are "properly the province of the jury") (citations omitted); *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 525 (2d Cir.1996), *overruled on other grounds by United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998); *Khairkhwa v. Obama*, 793 F.Supp.2d 1, 10 (D.D.C.2011).

 In considering a witness' practical experience and educational background as criteria for qualification, the threshold question is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth. *See Khairkhwa v. Obama*, 793 F.Supp.2d at 11 (citing *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 850 (6th Cir. 1981) (noting that an "expert need not have complete knowledge about the field in question, and need not be certain")); *Keenan v. Mine Safety Appliances Co.*, No. 03 CV 710, 2006 WL 2546551, at *2 (E.D.N.Y. Aug. 31, 2006) (explaining that for the "testimony to be admissible it need only assist the trier of fact in some way") (citations omitted); *Lappe v. Am. Honda Motor Co., Inc.*, 857 F.Supp. 222, 226 (N.D.N.Y.1994) (noting that the expert's

skill, knowledge, or experience should be such that the opinion will *"probably* aid the trier of fact in his search for the truth").

Courts have looked at an expert's "generalized qualifications," finding that a "broad range of knowledge, skills and training qualify an expert as such." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir.1994), *cert. denied*, 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). The totality of an expert's qualifications should be considered in evaluating whether or not his or her testimony is admissible. *Argonaut Ins. Co. v. Samsung Heavy Indus. Co. Ltd.*, 929 F.Supp.2d 159, 168 (N.D.N.Y.2013). An expert need not be precluded "from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute." *Yaccarino v. Motor Coach Indus., Inc.*, No. 03 CV 4527, 2006 WL 5230033, at *9 (E.D.N.Y. Sept. 29, 2006) (citations omitted). Indeed, where an expert possesses qualifications in a "general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Deutsch v. Novartis Pharm. Corp.*, 768 F.Supp.2d 420, 425 (E.D.N.Y.2011) (quoting *In re Zyprexa Products Liab. Litig.*, 489 F.Supp.2d 230, 282 (E.D.N.Y. 2007)). Thus, a witness' lack of particular knowledge, education, or experience may go to the weight, not the admissibility, of the testimony. *See, e.g., McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir.1995) (finding that the expert's alleged shortcomings in academic training in fume dispersal and lack of specific knowledge about the chemical constituents of the fumes, should be explored on cross-examination); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F.Supp.2d 448, 461 (S.D.N.Y. 2010) (finding that while the expert "may not be the world's leading expert" in the relevant field, plaintiffs' arguments regarding his qualifications went to the weight and credibility of the testimony); *Emig v. Electrolux Home Prods. Inc.*, No. 06 CV 4791, 2008 WL 4200988, at *5 (S.D.N.Y. Sept. 11, 2008) (finding the expert's lack of a post-graduate degree in engineering and absence of experience in a particular area of consumer products went to the weight of the testimony).

### 1) *Mr. Barbe's Background*

Mr. Barbe claims to "possess a considerable amount of particularized knowledge and expertise concerning the safety performance [and] design of the [Saw]." (Barbe Rep. at 1). He claims to be "familiar with the safety standards applicable to the Saw" and to have taken and taught courses concerning the risks associated with the use of saws, and the elimination of such risks. (*Id.*) Mr. Barbe asserts that as an expert in the field of safety engineering and loss control, he is well-positioned to assess the risks associated with the Saw at issue in this case. (*Id.*)

Mr. Barbe earned a Bachelor of Science degree from the Illinois Institute of Technology in Fire Protection Engineering and Safety Engineering. (Def.'s Ex. K;[18] *see also* Pl.'s Mem. at 5; Barbe Tr. at 90). Mr. Barbe is a "licensed safety engineer with over 35 years of experience in private consulting." (Pl.'s Mem. at 5; Barbe Rep. at 1). According to his *curriculum vitae*, Mr. Barbe is registered as a professional safety engineer in the Commonwealth of Massachusetts, the State of California, and

---

**18.** Citations to "Def.'s Ex. K" refer to Mr. Lewis C. Barbe's *curriculum vitae*, attached as Exhibit K to the Declaration of Michael K. Berman, filed February 21, 2014.

Canada. (Def.'s Ex. K). He is also a Certified Safety Professional ("C.S.P.") with the Board of Certified Safety Professionals; a Certified Product Safety Manager ("C.P.S.M.") with the Board of Product Safety Management; a Certified Hazard Control Manager ("C.H.C.M.") with the Board of International Hazard Control; and a Healthcare Safety Professional ("H.S.P.") through the Board of International Health Care Safety Professionals.[19] (*Id.*)

Mr. Barbe is currently employed by Occupational Safety & Health Services, Inc., where he has worked since the early 1970s. (Barbe Tr. at 5–6; *see also* Def.'s Ex. K). At one time, Mr. Barbe had an ownership interest in the company. (Barbe Tr. at 6). Mr. Barbe is also employed by two other entities: 1) Shredfast, a manufacturer of shredding trucks, where Mr. Barbe serves as Risk Manager; and 2) Garlock, which makes roofing and construction equipment, where he holds the position of Safety Engineer. (Barbe Tr. at 8–11). Mr. Barbe testified that at Shredfast, he is responsible for formulating and implementing a "safety program" which encompasses the construction, design, installation, and use of Shredfast's products.

(*Id.* at 11). He explained that at Garlock, where he serves as a safety engineer, he "deal[s] in the performance of a product to perform safely, based upon the foreseeable use and misuse of the product." (*Id.* at 12). When questioned about whether he is involved with designing particular products or guards, Mr. Barbe explained that "design mechanical engineers do the design work." (*Id.* at 15). However, he maintained that as a safety engineer, he is still involved in product design "but normally, restrict[s] [him] self to the performance of a product to perform safely doing fault-tree analysis, techniques for human-error projection, [and] job safety analysis." [20] (*Id.*)

From about 1969 to 1973, Mr. Barbe was employed by American Hoist and Derrick, during which time he "[f]ormulated their safely program for products, facilities, equipment services and construction." (Barbe Tr. at 105–06; Def.'s Ex. K). Mr. Barbe testified that he also worked at Westinghouse Electric for about three to four years, in the 1960s as Manager of Accident Prevention. (Barbe Tr. at 106–08).

According to his *curriculum vitae*, Mr. Barbe has taught courses in safety engi-

19. Mr. Barbe's *curriculum vitae* provides scant information pertaining to his claimed credentials. For example, only abbreviations for his professional titles are provided (i.e."C.S.P"), thus requiring the Court to determine the proper designations through internet research. A number of the Boards referred to, such as the Boards of Product Safety Management, International Hazard Control, and International Health Care Safety Professionals, cannot be readily found through basic internet searches. Moreover, Mr. Barbe's *curriculum vitae* does not indicate the length of time for which Mr. Barbe has held these certifications or whether any of the listed certifications have expired. Without any independent knowledge of whether these certifications require renewal, the Court will assume, for the purposes of this motion only, that Mr Barbe currently holds each listed certification.

20. Based on the Court's reading of Mr. Barbe's deposition transcript, it is unclear whether he is responsible for designing products or simply assessing a product's safety and functionality. (*See* Barbe Tr. at 12–15). For example, on the one hand, Mr. Barbe indicates that he "do[es] design work," but on the other hand, he insists that his work focuses on assessing product performance and safety. (*See e.g., id.* at 15). When asked whether he has designed an interlock device for the Saw, he responded, "No, I haven't and yes, I have." (*Id.* at 49). He asserts that he "know[s] how to design an interlock," but has never expressed his design concept "on paper." (*Id.* at 49–50).

neering at the United States Department of Labor ("DOL"), the International Brotherhood of Electrical Workers, and the University of California, Los Angeles, in addition to "numerous" private companies. (Barbe Rep. at 1; *see also* Pl.'s Mem. at 5). He also compiled a reference manual for the Occupational Safety & Health Administration ("OSHA"), which he claims sold 10,000 copies.[21] (Barbe Tr. at 93; *see also* Pl.'s Mem. at 5). Additionally, an article concerning Mr. Barbe's work, titled *Critical Incident Techniques,* was published in *National Safety News* magazine; it addresses how manufacturers can "accumulate knowledge ... [on] the frequency and severity of accidents in order to determine accident caus[ation]." (Barbe Tr. at 93–94). During his deposition, Mr. Barbe was able to recall only one published article that he himself had written. (*Id.* at 95).

In addition, Mr. Barbe is a participating member of "Underwriters Laboratory Standards UL 987 Standard for Stationary and Fixed Electric Tools," "American National Standards Code Safety of Machinery General Requirements and Risk Assessment," and "Construction safety standards and USNC/IEC TAG for IEC/TC 116, Safety of motor-operated electric tools."[22] (Barbe Rep. at 1; Pl.'s Mem. at 5).

According to Mr. Barbe, he is currently in the process of applying for a patent for a guard, which could be used on a woodworking table saw as well as a portable table saw.[23] (Barbe Tr. at 15–16). Mr. Barbe claims that he has been developing this device over the last two years, and that it would "apply to the ability of the spinning blade not to come into contact with a person's hand or fingers." (*Id.* at 96). Mr Barbe contends that his guard, as well as a variety of other designs—including a trap saw, interlock device, and SawStop (or, flesh-sensing) technology—are viable alternatives to the design of the Saw used in this case. (*See* Barbe Rep. at 14–15; Barbe Tr. at 49–50, 58–59, 61–64, 88). Mr. Barbe acknowledged that while he knows how to build an alternative design, for example, in the form of an interlock device, he has not done so to date. (Barbe Tr. at 65). Further, Mr. Barbe conceded that he is not aware of another table saw on the market that incorporates an interlock device and he conceded that the use of an interlock device would prevent certain cuts from being made. (*Id.* at 66, 68–69). Additionally, Mr. Barbe acknowledged that he was not aware of any portable benchtop saw on the market using flesh-sensing technology and that he has not personally done any design work to incorporate such technology into a bench-top saw. (*Id.* at 71, 74, 83). Instead, Mr. Barbe's familiarity with flesh-sensing technology appears to rely primarily on the research of Dr. Ste-

---

21. The content and title of this OSHA reference manual are not specified.

22. Neither the plaintiff's March 31, 2014 Memorandum of Law, nor Mr. Barbe's Report, attempt to define these standards or explain what it means for Mr. Barbe to be a "participating member." While the Court takes judicial notice that Underwriters Laboratory is "a global independent safety science company" that promulgates safety standards, *see* http://www.ul.com/aboutul/what-we-do (last visited Sept. 8, 2014), and is familiar with the ANSI standard, the others also appear to be professional organizations charged with developing safety standards applicable to various industries and products.

23. Mr. Barbe specified during his deposition that he is currently in the process of talking to a patent attorney. (*See* Barbe Tr. at 16, 93). It appears that at the time of his deposition, he had not yet applied for the patent. (*See id.* at 97). Mr. Barbe was reluctant to provide details concerning his patent, claiming that they were confidential. (*See* Barbe Tr. at 16, 97).

phen Gass, who invented SawStop.[24] (*Id.* at 71–74).

Mr. Barbe maintains that the Saw used by plaintiff did not actually contain a guard, since once the "barrier" device was removed from the Saw, it no longer provided "positive protection" and thus allowed plaintiff's injury to occur. (*See id.* at 20–30, 48 (explaining that the Saw "is inherently unsafe when the barrier that was put on is taken off")).

Mr. Barbe testified that he has been deposed approximately 400 to 500 times and has given trial testimony about 100 times. (*Id.* at 5). Mr. Barbe also indicated that he has provided deposition testimony on behalf of a manufacturer of a product, but did not recall the number of times or most recent time. (*Id.* at 99). He acknowledged that it is "probably correct" that over 90% of the times he has been deposed were on behalf of plaintiffs, but he maintained that he was not certain. (*Id.* at 100–01). Mr. Barbe indicated that he testified for a company called Zamboni "less than three" times in the last ten years. (*Id.* at 101–02). Mr. Barbe had worked as a safety engineer for that company for about 20 years. (*Id.*) Additionally, Mr. Barbe indicated that he has testified on behalf of various insurance companies that certain products

were not defective. (*Id.* at 102–03). However, when presented with a three-page report prepared by Mr. Barbe's secretary identifying his past testimony, Mr. Barbe was not able to identify any cases in which he testified on behalf of the defendant.[25] (*Id.* at 104).

Mr. Barbe also testified that he has used table saws about 100 times over the last several decades, for the purpose of investigating and inspecting the saws to assess matters at issue in litigation as well as to enhance the safety features. (*Id.* at 55–58).

### 2) *Analysis*

■ Defendant first argues that Mr. Barbe is not qualified to render an expert opinion in this case because he is neither an electrical engineer nor a mechanical engineer and he has no education or experience in designing table saws. (Def.'s Mem. at 12).[26] Although defendant contends that "[t]he design and manufacture of table saws, including specifically a blade guard for a table saw, falls under the discipline of mechanical engineering and the design of technology such as SawStop falls under the discipline of mechanical engineering, with electrical engineering concepts" (Def.'s Mem. at 12–13), defendant cites no authority for the assertion that only someone with this background is

---

24. In addition to inventing the SawStop technology, Dr. Gass founded a company called "SawStop" that sells saws equipped with the technology. (Def.'s Mem. at 5).

25. The contents and scope of this list are not clear from the deposition transcript. It is not specified whether this was purported to be a list of all or just some of the cases where Mr. Barbe has testified in the past.

26. Defendant also contends that Mr. Barbe fails to include certain prior employment information on his *curriculum vitae*. Specifically, defendant asserts that Mr. Barbe fails to mention that in the 1960s he worked with his family's insurance business, Loss Control Ser-

vices, and "was the subject of scandals related to the Chicago Mob." (Def.'s Mem. at 12 (citing Berman Decl. Ex. L)). Defendant also points out that Mr. Barbe held several jobs in the 1960s and 1970s "from which he was fired for improper behavior." (*Id.* (citing Berman Decl. Ex. M)). Although Mr. Barbe does not mention any of these prior jobs on his *curriculum vitae* and claims not to recall being fired from these jobs (Barbe Tr. at 109–121), it is unclear to this Court why any of this information is relevant to his expertise with table saws, other than to provide potential avenues for impeachment at the time of trial.

qualified to opine on the design of a guard for the Saw. Defendant further argues that Mr. Barbe has not lectured or taught courses on the design or manufacture of table saws, and he has not authored any published writings on the design of saws or guards. (*Id.* at 13). Defendant also notes that it is only within the last two years that Mr. Barbe has ever used a table saw; he "admitted to never taking a woodworking class; never owning a table saw; never working as a carpenter with a table saw; and never operating a table saw (except perhaps in connection with a litigation matter)." (*Id.* (citing Barbe Tr. at 37–43, 104–105)). Although Barbe testified that he is a "participating member of the UL 987 standard" (Barbe Tr. at 133), defendant asserts that during his deposition, Mr. Barbe "dodged questions" regarding the specifics of table saw design, safety standards, and SawStop, leading defendant to argue that Mr. Barbe's "lack of qualifications is readily apparent from even a cursory review of his deposition." (*Id.*)

However, plaintiff argues that Mr. Barbe's degree in Safety Engineering, licenses, certifications, publications and teaching experience qualify him to render an expert opinion as to the safety and design of the Saw, and that any arguments defendant may have as to his qualifications go to the weight to be given to his testimony and not its admissibility. (Pl.'s Mem. at 5, 7). As for the claim that Mr. Barbe is not qualified to render an opinion because he does not hold a degree in mechanical or electrical engineering, plaintiff argues that Mr. Barbe's Bachelor of Science degree in Safety Engineering and the

engineering courses that he took to earn his degree qualify him to render an opinion as to whether a product performs safely in light of its foreseeable uses and misuses. (*Id.* at 5). In addition, Mr. Barbe's work experience, including his work at Shredfast, where he formulated and implemented a safety program for Shredfast's products, and he "designed guards on Shredfast's ... equipment," [27] includes analyzing whether various products perform safely. (*Id.* at 6).

In response to defendant's argument that Mr. Barbe has no experience with table saws or specifically with the Saw at issue in this case, plaintiff asserts that Mr. Barbe has gained particularized knowledge of this Saw because he read "all the material on the saw," inspected the Saw, is familiar with applicable safety standards, and "his personal library contains numerous documents regarding the safety design, performance and safeguarding of the" Saw and the guards at issue.[28] (Pl.'s Mem. at 6) (quoting Barbe Tr. at 157). Finally, plaintiff contends that Mr. Barbe has been qualified as an expert in "hundreds of cases," testifying at trial approximately 100 times. (*Id.* at 8–9). Specifically, plaintiff cites the holding in *Powers v. Husqvarna Forest & Garden Co.*, No. 00 CV 6490, 2004 WL 2202652, at *2 (W.D.N.Y. Sept. 28, 2004), where the court found Mr. Barbe qualified to testify as an expert relating to a defective chain saw. The court stated:

> Mr. Barbe is a safety engineer. He is registered as a safety engineer in Massachusetts and California, has a Bachelor of Science degree in Safety Engi-

---

**27.** Defendant notes that Mr. Barbe admitted that he had not actually "design[ed]" the guard for the Shredfast paper shredder. (Def.'s Reply at 3).

**28.** Defendant contends that Mr. Barbe has no engineering, design, or teaching experience

specific to table saws, and that Mr. Barbe admitted at the deposition that he was not familiar with the details of UL 987, the safety standard applicable to the Saw. (Def.'s Reply at 6).

neering from the Illinois Institute of Technology and has been employed in private industry as a Safety Engineer. While the defense has pointed out weaknesses in the methods Barbe used to form his opinions in this case and his alleged lack of experience in safety engineering of chain saws, ... I find these weaknesses go to the weight of his testimony and are not grounds for excluding his opinion altogether.

*Id.* at *2. Mr. Barbe also testified as an expert in *Thompson v. Sunbeam Prods., Inc.*, No. 10 CV 98, 2011 WL 4502049, at *5 (S.D.Ohio Sept. 28, 2011), *aff'd*, 503 Fed.Appx. 366 (6th Cir.2012), providing testimony that the instructions that came with a hand mixer were defective [29] and the proximate cause of the plaintiff's injuries because they did not warn against wearing jewelry around the moving parts of the mixer and did not contain some signal such as "danger" in a different color. Although the court in *Thompson* did not conduct a formal *Daubert* analysis of Barbe's qualifications and the scientific basis for his testimony, it granted summary judgment in favor of defendant, rejecting Barbe's testimony, since Barbe had agreed that the injury would not have occurred had the plaintiff heeded the warning. *Id.* at *11. The court noted that not only had Mr. Barbe failed to examine or test the mixer, but he also could not explain why the words "IMPORTANT SAFEGUARDS" in large print, the "literal equivalent of 'danger,'" were not sufficient and why a warning to keep jewelry from coming into contact with the beaters was necessary when the warning explicitly warned that body parts and clothing should be kept away from the beaters during operation. *Id.* at *10; *see also Humphrey v. Diamant Boart, Inc.*, 556

F.Supp.2d at 176 (finding that although the expert had no experience or education relating to the analysis of hand saws, he was qualified to render an opinion regarding the guarding mechanism on a saw by virtue of his Bachelor's Degree and Master's Degree in mechanical engineering and his Ph.D in Engineering Science, and his experience as an engineering consultant, which included designing various items, including guards on a stationary punch press and hand exerciser; "the expert's lack of experience with saws goes to the weight of his testimony, not its admissibility"); *Peretz v. Home Depot, Inc.*, 08 CV 4106, 2009 WL 3124760, at *2–3 (E.D.N.Y. Sept. 29, 2009) (finding expert "to be sufficiently qualified to offer his opinion as an expert, albeit barely" regarding the guard in a grinder, even though he had not studied mechanical engineering, had limited knowledge of standards and never designed a grinder). *But cf., Fernandez v. Cent. Mine Equip. Co.*, 670 F.Supp.2d 178, 183–84 (E.D.N.Y.2009) (finding expert in drilling accident case not qualified even though he had a B.S. and Masters degree in mechanical engineering, was employed with a forensic firm specializing in mechanical engineering, had taught courses in engineering, but had little expertise in geotechnical field, never operated any drilling rigs and never consulted for a drilling company); *Quintanilla v. Komori Am. Corp.*, No. 04 CV 5227, 2007 WL 1309539, at *4 (E.D.N.Y. May 4, 2007) (precluding as not qualified an engineer with no experience with printing presses or design of machine guards, even though he had experience in mechanical design for electronics); *Berry v. Crown Equip. Corp.*, 108 F.Supp.2d 743, 750–51, 755 (E.D.Mich.2000) (finding self-employed "safety consultant" with no graduate de-

---

**29.** Mr. Barbe also criticized the mixer for having exposed moving parts, but that was not the basis for his opinion, which was limited to the defective warnings. *Id.* at *5.

grees, no published articles on forklifts, no leadership position in safety organization, who never designed a product related to forklifts, and had only worked as a forklift operator in a sit down model, not qualified to render opinion).

Having considered Mr. Barbe's qualifications, the Court finds that it is not necessary that Mr. Barbe be an electrical or mechanical engineer in order to opine on questions of the safety elements of a product's design. As a safety engineer, registered in two states, with the education and experience that he has obtained in the course of his career, he is qualified to render an opinion as to whether a product performs safely in light of its foreseeable uses and misuses. The Court acknowledges that he has very little experience with the table saw at issue, has not published any articles on saws, and although he claims to have designed a guard for a saw, he declined to provide any details that would allow the defendants and the Court to evaluate his expertise in this area. While Mr. Barbe's knowledge of this particular table Saw appears to be limited, nevertheless, the Court concludes that he is qualified, "albeit barely," to testify in this case, and his lack of knowledge and experience goes to the weight of his testimony.

### D. Reliability of Testimony

#### 1) Reliability Standards

 Once the proposed expert has "crossed the foundational threshold of establishing his personal background qualifications as an expert, he must then provide further foundational testimony as to the validity and reliability of his theories." Berry v. Crown Equip. Corp., 108

F.Supp.2d at 749 (citing Isely v. Capuchin Province, 877 F.Supp. 1055, 1064 (E.D.Mich.1995)). Thus, in addition to determining whether an expert witness is qualified to render an opinion regarding a specific issue or area of expertise, the court is required to exercise a "gatekeeping" function that revolves around the question of whether the expert's testimony is reliable and will be of assistance to the trier of fact in evaluating the evidence. The standards for evaluating the reliability of an expert's reasoning and methodology were first set out by the Supreme Court in 1993 in Daubert v. Merrell Dow Pharmaceuticals, Inc., where the Court rejected the test previously enunciated in Frye v. United States, 293 F. 1013 (D.C.Cir. 1923),[30] as being at odds with the "liberal thrust" of the Federal Rules of Evidence. 509 U.S. at 588, 113 S.Ct. 2786; F.D.I.C. v. Suna Assoc., Inc., 80 F.3d 681, 686–87 (2d Cir.1996); see also Iacobelli Constr., Inc. v. Cnty. of Monroe, 32 F.3d 19, 25 (2d Cir.1994). The test set forth in Daubert requires the court to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 592–93, 113 S.Ct. 2786. Among the factors to be evaluated by the court in its determination are: (1) the ability to test the expert's methodology or reasoning; (2) whether the expert's theory has been subjected to peer review and publication; (3) its potential rate of error; and finally, (4) its general acceptance in the relevant scientific community. See id. at 592–94, 113

**30.** The Frye test for determining the admissibility of such evidence required the party seeking to introduce the opinion testimony to establish, as a foundation, that the opinion

was one of "general acceptance" in the scientific community. Frye v. United States, 293 F. at 1014.

S.Ct. 2786; *see also Iacobelli Constr. Inc. v. Cnty. of Monroe,* 32 F.3d at 25.

In *Kumho Tire Co., Ltd. v. Carmichael,* the Supreme Court made it clear that the *Daubert* gatekeeping analysis applies to "all expert testimony," including "all 'scientific,' 'technical,' or 'other specialized' matters." 526 U.S. at 147, 119 S.Ct. 1167 (quoting Fed.R.Evid. 702); *see also Brooks v. Outboard Marine Corp.,* 234 F.3d 89, 91 (2d Cir.2000). The Court emphasized, however, that any inquiry into reliability need not be limited to the four factors listed in *Daubert.* and these guidelines must be applied with flexibility, particularly when the expert is offering opinions based on specialized personal knowledge rather than scientific studies. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. at 150, 119 S.Ct. 1167; *see also Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. at 593–94, 113 S.Ct. 2786 (explaining that the list of factors is not exhaustive and no one factor is considered dispositive; and also emphasizing that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one"); *Borgognone v. Trump Plaza,* 98 CV 6193, 2000 WL 341135, at *3 (E.D.N.Y. March 9, 2000). Moreover, it is clear under *Kumho* that regardless of an expert's experience and his expertise, the court must still perform its gatekeeping function and examine the methodology used by the expert in reaching his opinion in order to determine if it is "reliable" and will assist the jury. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. at 149, 119 S.Ct. 1167.

 In addition, "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. at 592, 113 S.Ct. 2786 (citing Fed.R.Evid. 702, 703). Under the Federal Rules of Evidence, if an expert opinion is based upon facts or data "that the expert has been made aware of or personally observed," the opinion is admissible, even where the underlying facts and data are not, as long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed.R.Evid. 703. However, "if the facts or data [relied on in forming the expert's opinion] would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." *Id.; see also Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. at 595, 113 S.Ct. 2786 (citations omitted). As the court in *Baker v. Urban Outfitters, Inc.,* noted, "[t]hough the weight given to expert testimony should be left to the finder of fact, expert testimony should be excluded altogether if it is 'speculative' or 'conjectural' or if it is based on assumptions 'so unrealistic and contradictory as to suggest bad faith.'" 254 F.Supp.2d 346, 353 (S.D.N.Y.2003) (quoting *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996)); *see also Peretz v. Home Depot Inc.,* 2009 WL 3124760, at *1. Where the expert's testimony is "connected to existing data only by the ipse dixit of the expert," the court may determine that there is an insufficient analytical connection between the opinion offered and the supporting facts to warrant admission of the expert's opinion. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *see also Peretz v. Home Depot Inc.,* No. 08 CV 4106, 2009 WL 3124760, at *1 (E.D.N.Y. Sept. 29, 2009).

 Finally, it is important to note that "[t]he proponent of the expert testimony bears the burden of establishing the admissibility of such testimony under the *Daubert* framework by a preponderance of the evidence standard." *Hollman v. Taser*

*Int'l. Inc.*, 928 F.Supp.2d 657, 666 (E.D.N.Y.2013) (citing *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. at 592, n. 10, 113 S.Ct. 2786).

#### 2) *Reliability of Mr. Barbe's Opinion*

Apart from arguing that Mr. Barbe is not qualified to render an expert opinion in this case, defendant argues that his opinions should be precluded as inherently unreliable under Rule 702 and *Daubert.* (Def.'s Mem. at 14).

##### a) *Mr. Barbe's Report*

██ Plaintiff presented a 16–page–long report prepared by Mr. Barbe; two pages discuss the plaintiff's experience and methodology, ten pages list materials in Mr. Barbe's personal library, and only four pages are devoted to Mr. Barbe's opinions in this case. Mr. Barbe's report fails to adequately explain how he arrived at his conclusions. While Mr. Barbe explains in his "Methodology" section that he has "utilized the principles of engineering and safety engineering to arrive at my opinions" and proceeds to list four "principles" that he claims safety engineers follow "in rendering professional opinions as to the cause of injuries/incidents," (Barbe Rep. at 2), he does not explain how he applied these principles in reaching the conclusions set forth in his "Opinions" section. (*See* Barbe Rep. at 13–14). Instead, Mr. Barbe's opinions concerning the defective design of the Saw consist primarily of conclusory statements, such as "[t]he Saw was defective at the time of sale, due to the lack of proper interlocks, safety guards/proper guarding at the point of operation of the machine" (*id.* at 13); and "[t]he Saw was unsafe as it was defectively designed and assembled for its foreseeable uses and misuses." (*Id.* at 14).

Mr. Barbe's conclusions concerning alternative designs are similarly without analysis or support. He asserts, for example, that "if a guard is placed at the point of operation on the Saw, the dangers of coming in contact with its moving parts will be eliminated"—an assertion that seems self-evident based solely on common sense. Moreover, in discussing alternative designs, Mr. Barbe's report simply asserts that "if a proper permanent guard or other design had been used, the incident/injury would not have occurred." (Barbe Rep. at 14). Although he asserts that there were feasible alternative designs available at the time of manufacture in 2006, he only mentions, but does not describe in detail, a "permanent guard," interlocks, and "trap guards," without further explanation, and the Saw Stop technology, which he conceded at his deposition had not been employed with this type of saw. (*Id.* at 13–14; Barbe Tr. at 84). More importantly, he provides no analysis of the feasibility or cost of installing any of these alternatives, nor does he address the effect that these designs would have on the utility of the Saw. (Barbe Tr. at 15).

In a products liability case, the "touchstone" of an expert's report should be a comparison of the utility and cost of the product's design and alternative designs. *Barban v. Rheem Textile Sys., Inc.*, No. 01 CV 8475, 2005 WL 387660, at *5 (E.D.N.Y. Feb. 11, 2005). This comparison should usually be supported by testing of the alternative design. *Smith v. Herman Miller, Inc.*, No. 03 CV 5358, 2005 WL 2076570, at *4 (E.D.N.Y. Aug. 26, 2005); *Kass v. West Bend Co.*, No. 02 CV 3719, 2004 WL at 2475606, at *6 (E.D.N.Y. Nov. 4, 2004). Mr. Barbe's conclusions do not contain any such comparisons or testing. Thus, his report lacks sufficient detail for the Court to evaluate the reliability of his opinions.

##### b) *CPSC Statistics*

██ In addition to the overall vague and unsupported nature of his report, de-

fendant raises specific objections to certain aspects of Mr. Barbe's report and testimony. As an initial matter, defendant challenges Mr. Barbe's opinion that the Saw is defective based on statistical accident data gathered by the Consumer Product Safety Commission ("CPSC"). (*Id.* at 18–19).[31] Specifically, in his opinion, Mr. Barbe cites statistics from the CPSC that estimate that 10 finger amputations a day result "just from table saws," at a cost to society. of almost $2 billion a year. (Barbe Rep. at 14). When questioned at his deposition about the guarding device that is supplied with the saw, Mr. Barbe disputed defendant's contention that it was a "guard," stating that such a notion was "ridiculous," and, citing the CPSC statistics, he asked: "How can I amputate 10 people's fingers a day and say that the machine is guarded ...." (Barbe Tr. at 31). He further opined: "When the Consumer Product Safety Commission says 10 fingers amputated a day, something is wrong with the machine." (*Id.* at 28). Defendant challenges Mr. Barbe's reliance on this data and seeks to preclude Mr. Barbe's testimony, arguing that Mr. Barbe, "without conducting any independent testing, engineering analysis or data analysis of his own," reaches this opinion about the safety of the saw even though he conceded that he does not know how the CPSC data is collected, nor does he know whether there has ever been a non-defective table saw sold on the market. (*Id.* at 18, 19).

According to defendant, the statistical accident data upon which Mr. Barbe relies is not reasonably relied upon by experts in the field. (*Id.* at 19–23). The data, according to defendant, is collected from the NEISS system, which records emergency room visits associated with particular consumer products, but the data is collected from only about 2% of emergency rooms across the country. (*Id.* at 20). From this limited sample of self-reported injuries, the CPSC extrapolates to determine the total number of injuries across the country that are related to a particular product (*Id.*) Defendant contends that the results are unreliable because they include various models and types of saws, as well as different types of accidents. Further, the conclusions rely on various levels of hearsay, starting with the patient, hospital staff, records, and statistical extrapolation. (*Id.* at 20–22). As defendant argues, not only does the CPSC advise against relying on this data, but plaintiff cannot demonstrate that experts in the field of table saw design would rely on it in concluding that the Saw was defectively designed, particularly since the statistics do not take into account the number of cuts successfully made with table saws where no injuries occur. (*Id.* at 22–23).

Courts have rejected testimony similar to Mr. Barbe's opinion that the saw is inherently dangerous simply because there are so many injuries involving table saws. In *Barban v. Rheem Textile Systems, Inc.,* the plaintiff's expert, a "self-proclaimed engineering consultant" with bachelors and masters degrees in mechanical and civil engineering, was offered to opine on the design of a laundry press that had lowered onto plaintiff's hand, causing serious injuries. No. 01 CV 8475, 2005 WL 387660, at *3 (E.D.N.Y. Feb. 11, 2005). He testified

---

**31.** Plaintiff argues that Mr. Barbe does not rely solely on these statistics. (*See* Pl.'s Mem. at 13 (stating: "Defendant's contention ... that Mr. Barbe's proposed testimony that 'table saws involved in accidents are defective' is not based on scientific data is totally unfounded")). According to plaintiff, the true "thrust" of Mr. Barbe's opinion is that the Saw is defective since, when the guard was removed, "the user [was required to] devise methods to safely operate it." (*Id.* at 14).

that the press was inherently dangerous even though it met all recognized standards and regulations. *Id.* at *4. The court held that his testimony, that if a machine injures someone, it is the defect of the machine, "contradicts the well-established principle in tort law that a manufacturer is not an insurer against injury, nor must the product be accident proof." *Id.* at *6. The court further noted that the expert's proffered testimony revealed a lack of scientific rigor, *id.,* in that the expert had never designed any machines; never conducted studies or authored articles related to dry cleaning; had no familiarity with head guards; never saw the design documents or blueprints for the press; never ascertained if the machine had been repaired; offered no alternative designs; did not undertake a utility study in tandem with safety concerns; and ignored the fact that no other manufacturer had safety guards on this type of press. *Id.* at *5–7.

Mr. Barbe's conclusion that all table saws are defective because, based on the CPSC statistics, so many people are injured every year is similarly without scientific rigor. As defendant notes, the data is not limited to specific manufacturers or models of saws, and there is no information to verify that the accidents reported were the result of the absence of a guarding mechanism—which is the heart of Mr. Barbe's theory—or were caused by some other defect. Even if there was no question as to the reliability of the data, which is based on patient self-reporting, and the methods used to extrapolate from the reported data were appropriate, there is no evidence that the conclusions drawn from this data have been verified by or relied upon by other experts in the field of table saw design, and the CPSC explicitly advises against reliance on this data to deter-

mine the number of accidents caused by a specific product. (Def.'s Mem. at 22).

Thus, the Court finds that Mr. Barbe's testimony, to the extent that it is based on the CPSC data, is not sufficiently reliable to satisfy *Daubert* and *Kumho,* and would not assist the jury in reaching a decision in this case.

c) *Mr. Barbe's Alternative Design Theories*

i) *Permanent Guard or Interlock Device*

██ Defendant also challenges Mr. Barbe's overall conclusions in light of his inability to provide any meaningful details regarding the design of the Saw, and his failure to offer any proposed alternative design. (*Id.* at 24–29). As defendant points out, Mr. Barbe has no experience designing table saws or guards for table saws, and in fact, he admits he has never owned a table saw, nor has he worked extensively with one beyond his work on this case and his efforts to patent his own guard. (Barbe Tr. at 15–16, 97–99). Although he proposes that the Saw should have been designed with a permanent guard in place or with an interlock system that would have prevented the Saw from operating if the blade guard was not in place, Mr. Barbe admits that the interlock system has only been designed "in [his] mind;" he has not presented any design drawings, nor can he point to any table saws on the market that have this interlock design. (*Id.* at 49,64–65). Indeed, he has not shown that such an interlock device has ever been tested or evaluated in connection with this type of Saw. (*Id.* at 65, 68). Finally, he does not address the defendant's argument that a permanent guard would reduce the utility of the Saw by preventing certain types of cuts, but he concedes that an interlock system would

impede the utility of the Saw.[32] (Barbe Tr. at 68–69).

In analyzing the opinions offered by Mr. Barbe as to alternative designs, the Court has considered the nonexclusive factors set forth in *Daubert* to determine if an expert's opinion is grounded in scientific methodology. These are: 1) whether the proferred theory has or can be tested; 2) whether the theory has been subjected to peer review; 3) whether the theory has been evaluated in light of potential rates of error; and 4) whether the theory has been accepted in the relevant scientific community. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. at 593, 113 S.Ct. 2786. The "lack of testing, or more generally the failure to take any steps that would show professional rigor in the assessment of the alternative designs" has been, in several cases, fatal to the admissibility of the expert's opinion. *See, e.g., Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869 (7th Cir.2001): *see also Zaremba v. General Motors Corp.*, 360 F.3d 355 (2d Cir.2004) (precluding testimony of biomechanical engineer regarding a safer alternative design of a vehicle involved in a rollover accident, finding that his opinion as to the design was speculative and unreliable because he had no alternative design drawings, no calculations, had not tested the design or subjected it to peer review; there was no known rate of error and he had not shown general acceptance of the design or methodology). In *Dhillon*, the court considered an expert's opinion that a forklift truck should have had a rear door that would have prevented the plaintiff's leg from slipping out of the truck during an accident. 269 F.3d at 868. The court

held that the expert in an alternative design case must perform tests to see if the alternative design is "both economically feasible and just as safe or safer" than the model at issue. *Id.* at 870. This includes consideration of the "degree to which the alternative design is compatible with existing systems," the relative efficiency of the two designs, short and long term maintenance costs, and the effect the alternative design would have on the machine. *Id.* (quoting *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir.1996)).

Here, there appears to be no dispute that Mr. Barbe has no scientific or technological basis on which to render an opinion that an interlock device exists that could be used on this Saw that would be both economically feasible and safer than the guarding device provided with the Saw. There is no dispute that Mr. Barbe has not designed such a device for the Saw, and has conducted no studies to determine if the interlock device would satisfy industry standards. (*See* Barbe Tr. at 49–50); *Sorto–Romero v. Delta Int'l Machinery Corp.*, No. 05 CV 5172, 2007 WL 2816191, at *5 (E.D.N.Y. Sept. 24, 2007) (excluding expert's testimony regarding a wood shaper guard where the expert never owned or used a wood shaper, had no opinion as to whether an interlock would be feasible, never designed one for a wood shaper and conceded that the existing guard complied with ANSI standards). Indeed, Mr. Barbe does not claim that an alternative interlock device or any other permanent guard exists that has been adopted by other manufacturers or even that his theory mat an interlock would be a feasible alternative

---

**32.** Although Mr. Barbe does not specifically admit that a "permanent guard" would impede the utility of the Saw, his testimony seems to be that an interlock is actually a kind of permanent guard, and he does not propose or suggest any other type of permanent guard, other than an interlock system. Since an interlock is the only permanent guard design that Mr. Barbe has proposed, he has not shown that any permanent guard would be feasible. ·

design has been subject to peer review. Given that the interlock device prevents the removal of the guard, it would interfere with the operation of the Saw in its ability to perform certain types of cuts and render the Saw less effective overall. (*See* Barbe Tr. at 68–69 (conceding that a saw with an interlock system cannot make "non-through" cuts)).

Accordingly, for all these reasons, the Court concludes that Mr. Barbe's testimony regarding the use of an interlock design should be excluded as lacking in reliability. *See Brooks v. Outboard Marine Corp.*, 234 F.3d at 92 (excluding expert's testimony that a kill switch should have been installed on the engine of a motorboat, finding the testimony unreliable and speculative because the expert had not done any actual testing, never saw the boat, never spoke to the people involved in the accident to attempt to reconstruct the accident, and had failed to perform any tests as to his theory of causation); *Kass v. West Bend Co.*, No. 02 CV 3719, 2004 WL 2475606, at *6 (E.D.N.Y. Nov. 4, 2004) (holding that "courts have repeatedly rejected expert testimony where a proposed theory or alternative design was not properly tested for safety or utility").

ii) *Trap Guard or Trap Saw*

Similarly, with respect to Mr. Barbe's proposed alternative design of a "trap guard" or "trap saw," Mr. Barbe's report does not indicate that he has designed such a device to work with this Saw, or done any testing of such a device to determine its feasibility and compliance with industry standards. Indeed, although his report suggests that "trap guards" were available—stating, "[t]he feasibility of an alternative design (i.e. trap guards, etc.) was available when the saw was designed, manufactured and sold" (Barbe Rep. at 14)—Mr. Barbe provides no further infor-

mation regarding these "trap guards." Moreover, to the extent that a "trap guard" is different from a "trap saw," Mr. Barbe fails to identify any manufacturer that has used such a device on the type of saw at issue in this case, nor does he provide any support for his claim that such a device was available. In analyzing the reliability of the expert's testimony, the "key question" is whether it can be and has been tested; this "ensures that the focus of the jury's deliberation is on whether the manufacturer could have designed a safer product, not on whether the expert's proposed but untested hypothesis might bear fruit." *See Sorto–Romero v. Delta Int'l Machinery Corp.*, 2007 WL 2816191, at *7. Although the court in *Humphrey v. Diamant Boart, Inc.* held that even where there is a lack of testing of the alternative design, "such testimony is not required if the expert can point to an existing design in the marketplace . . .," 556 F.Supp.2d at 177, 178, here, there is no evidence of an existing trap guard design on the market that could be used with this Saw.

Similarly, to the extent that Mr. Barbe suggests that a "trap saw," is a feasible alternative design, it is clear from his testimony that a trap saw is an entirely different device from a table saw. Again, Mr. Barbe did not seem to have basic information regarding existing "trap saws," such as how much they weigh, or whether their design could be adapted to work with a portable saw such as the one at issue here. Nor did Mr. Barbe provide any evidence regarding whether trap saws can make all of the same cuts as a table saw or be used at construction sites. A plaintiff cannot satisfy his burden to propose a feasible alternative design by proposing that an entirely different product could have been used. *See Simon v. Smith & Nephew, Inc.*, 990 F.Supp.2d 395, 405 (S.D.N.Y. 2013) (holding that "an allegation that [de-

fendant] could have manufactured a different product altogether, or that others have done so, does not itself make out a plausible claim of design defect"); *Pinello v. Andreas Stihl AG & Co. KG*, No. 08 CV 425, 2011 WL 1302223, at *16 (N.D.N.Y. Mar. 31, 2011) (holding that plaintiff's contention that an "entirely different product" could have been used did not create a dispute of material fact as to whether there was an alternative design).

Accordingly, because Mr. Barbe has failed to provide any evidence that a "trap guard" could be used on the Saw, and simply relies on the existence of a "trap saw," a different kind of saw than the one here, without having tested or designed such a device to work with this Saw, the Court finds that Mr. Barbe's proposed alternative design of trap saw or trap guard is unsupported by scientific methodology and does not satisfy the standards of reliability required by *Daubert*.

### iii) *SawStop Technology*

■ With respect to Mr. Barbe's opinion that SawStop technology should have been employed on this Saw, defendant argues that Mr. Barbe lacks the required expertise to determine if SawStop was a feasible option for use with this Saw. (Def.'s Mem. 28–29). Mr. Barbe has not taken any steps to determine that the SawStop technology or any other alternative guarding system that he proposes is feasible. He has not done any testing of the technology himself (Barbe Tr. at 74, 88); and his opinion is devoid of any analysis of the compatibility of the technology with the type of saw at issue in the case. (*See* Barbe Tr. at 146–47). Indeed, defendant contends that the SawStop technology has never been utilized in connection with a portable saw like the one at issue

here, but rather has been limited to larger stationery table saws. (*Id.* at 85). Mr. Barbe, in fact, conceded that he did not know if such a portable saw could be engineered with SawStop technology and he admitted that currently there is no such saw with this technology on the market. (Barbe Tr. at 83, 89). In addition, as defendant points out, Mr. Barbe's opinion neglects to consider the expense of this technology, its impact on the ability of the purchaser to utilize the saw for different types of cuts, or the cost of maintenance, which may be significant because whenever activated, the impact of the technology results in the need to replace the blade mechanism. In urging the use of this technology as an alternative design, Mr. Barbe conceded that he was relying almost exclusively on the information regarding the technology that he had gleaned from the inventor of SawStop, Dr. Gass. Although Mr. Barbe relies on statements from Dr. Gass, it is unclear whether the technology has been subject to peer review or generally accepted in the relevant community. Mr. Barbe concedes that the technology has not been adopted by any saw manufacturers other than the inventor of the technology itself. (Barbe Rep. at 14); *Dhillon v. Crown Controls Corp.*, 269 F.3d at 870 (noting that there was no evidence of peer review, no evidence that any forklift manufacturer had adopted the technology and that despite efforts to persuade the ANSI committee to adopt the requirement, the committee twice rejected the idea).[33]

In *Auther v. Oshkosh Corp.*, No. 09 CV 527, 2013 WL 5272959 (W.D.N.Y. Sept. 16, 2013), the court precluded the testimony of an expert called upon to explain how a tire rim and tire were ejected from a truck. In finding the expert's opinions unreliable,

---

**33.** Despite efforts by Dr. Gass, the CPSC has not adopted any requirement regarding the

use of SawStop technology in the manufacture of this type of saw. (Barbe Rep. at 14).

the court noted that the expert had done nothing beyond reading the reports of others in reaching his conclusions; he had made no attempt to validate their reports or to draw upon their testing to reach his own conclusions, and indeed, could only describe the vehicle in a "general sense," being unfamiliar with the specific mechanism that might have caused the rim to fail. *Id.* at *4. The court noted that while experts "may rely upon factual data from others, their opinions should not be used as the basis for the witness' conclusions." *Id.* at *3 (quoting *United States v. 102.93 Acres of Land Situate in the Town of Huntington, Suffolk County, New York,* 154 F.Supp. 258, 261 (E.D.N.Y.1957), *aff'd,* 257 F.2d 805 (2d Cir.1958)). Finally, the court noted that the expert lacked familiarity with the applicable safety codes and guidelines, even though he was a member of the organization that published the codes. *Id.* at *4. Like the expert in *Auther,* Mr. Barbe's opinion is based largely on the reports of others and despite his position as a participating member of Underwriters Laboratory Standards ("U.L."), and ANSI's Code Safety of Machinery General Requirements and Risk Assessment, Mr. Barbe conceded that he was not familiar with the UL standard that applies to this Saw. (Def.'s Reply at 6).

Based on the lack of scientific basis, and the lack of testing or peer review of the SawStop technology in connection with the type of Saw at issue, the Court concludes that Mr. Barbe's testimony regarding this technology as an alternative design is also lacking in reliability sufficient to satisfy the *Kumho* and *Daubert* standards.

#### iv) *Other Design Alternatives*

Mr. Barbe may also be opining that there are other feasible alternative designs. He concludes his report by stating: "[t]he design principles of comparable saws, utilizes long recognized engineering concepts and principles." (Barbe Rep. at 16). However, he does not elaborate further, either in his report or deposition, on any design principles used in other saws other than those already discussed. Thus, the Court concludes that Mr. Barbe is not qualified to testify regarding alternative designs in this case, and respectfully recommends that his testimony as to alternative designs be excluded in its entirety.

#### d) *Failure to Warn*

Mr. Barbe also offers an opinion regarding the sufficiency of the warning label on the Saw, opining that although the label contains the word "Warning," it was defective because it should have said "Danger." (Barbe Tr. at 165–66). Although not in his report, Mr. Barbe also testified at his deposition that the instruction manual should have told users to use "extra care" when operating the Saw without the guard and to warn about "kickback." (Pl.'s Mem. at 14; Barbe Tr. at 175, 178).

However, based on the photographs of the Saw attached as Exhibit E to the Declaration of Michael K. Berman, the labels on the Saw actually comply with Mr. Barbe's suggestions. While some labels on the saw used the word "warning," at least one used the word "DANGER," in white letters against a red background. (Def.'s Ex. E). In addition, the saw contained two separate labels warning users of the danger of kickbacks. (*Id.*) Similar testimony from Mr. Barbe was rejected in *Thompson v. Sunbeam Prods., Inc.,* 2011 WL 4502049, at *10.[34] Moreover, in light of plaintiff's own testimony, there appears

---

**34.** In fact, in *Thompson,* Mr. Barbe opined that the warning "IMPORTANT SAFEGUARDS" was not sufficient and that it should have stated "Danger," which is exactly what the label here said. 2011 WL 4502049, at *10.

to be no question that any change in the warning would not have prevented this accident. Indeed, plaintiff testified that he read the Danger label and was aware from experience of the danger of operating the Saw without the guard; he also was aware of the concept of kickback. (Pl.'s Dep. at 129–30). Thus, even with Mr. Barbe's testimony, plaintiff would be unable to establish that any defect in the warnings on the Saw proximately caused plaintiff's injuries. Therefore, the Court respectfully recommends that his testimony as to the sufficiency of the warnings be precluded as not sufficiently reliable.

## II. *Summary Judgment*

Defendant moves for summary judgment, arguing that, if Mr. Barbe is disqualified, and his expert testimony is excluded, plaintiff will be unable to sustain his burden of proof on any of his claims. (*See* Def.'s Mem. at 31–33).

### A. *Summary Judgment Standard*

It is well-settled that a party moving for summary judgment has the burden of establishing that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990) (quoting Fed.R.Civ.P. 56(c)). Since summary judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury, *see Egelston v. State Univ. Coll. at Geneseo*, 535 F.2d 752, 754 (2d Cir.1976) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975)); *Gibralter v. City of New York*, 612 F.Supp. 125, 133–34 (E.D.N.Y.1985), the court should not grant summary judgment unless it is clear that all of the requirements of Federal Rule of Civil Procedure 56 have been satisfied. *See Auletta v. Tully*, 576 F.Supp. 191, 194 (N.D.N.Y.1983), *aff'd*, 732 F.2d 142 (2d Cir. 1984). In addition, " 'the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

Once the moving party discharges its burden of proof under Rule 56(c) of the Federal Rules of Civil Procedure, the party opposing summary judgment "has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.' " *Phillips v. Kidder, Peabody & Co.*, 782 F.Supp. 854, 858 (S.D.N.Y.1991) (quoting Fed.R.Civ.P. 56(e)). Rule 56(e) "provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256, 106 S.Ct. 2505. Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247–48, 106 S.Ct. 2505. In deciding a motion for summary judgment, the court should only look to admissible evidence. *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir.2013) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir.1997)). Thus, the trial court should not consider the testimony of an expert it has found to be unreliable in evaluating a motion for summary judgment. *See Nora Beverages, Inc. v. Perrier Group of Am.*, 164 F.3d at 746 (refusing to consider expert testimony on summary judgment after finding it inadmissible).

### B. *New York Products Liability*

■ In his Complaint, plaintiff alleges that defendant should be held liable for his

injuries under theories of negligence, strict liability, and breach of warranty based on alleged design defects in the Saw, and for failing to provide adequate warnings. (*See supra* at 231). New York law provides four theories upon which a claim of products liability may be founded: (1) express warranty; (2) implied warranty; (3) negligence; and (4) strict liability. *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106–07, 463 N.Y.S.2d 398, 401, 450 N.E.2d 204, 207 (1983). In order to make out a prima facie case on any of these four theories, the plaintiff must show that the product at issue was defective, and that the defectively designed product was the actual and proximate cause of the plaintiff's injury. *Id.* at 107–09, 463 N.Y.S.2d at 402–03, 450 N.E.2d at 208–09; 89 N.Y. Jur.2d Products Liability § 2.

■ There are three types of defects recognized under New York law: (1) design defects; (2) manufacturing defects; and (3) defective or inadequate warnings. *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d at 106, 463 N.Y.S.2d at 401, 450 N.E.2d at 207; *McCarthy v. Olin Corp.*, 119 F.3d 148, 154–55 (2d Cir.1997). In this case, plaintiff claims that design defects and a failure to provide adequate warnings caused plaintiff's injuries.

### 1) *Design Defect*

■ Plaintiff alleges that the Saw was defectively designed. (*See* Compl. ¶ 12 (alleging that defendant "was careless and negligent in the design ... of the [Saw]")). In order to prove the existence of a design defect, the plaintiff must show that "(1) the product, as designed, posed a substantial likelihood of harm; (2) that it was feasible for the manufacturer to design the product in a safer manner; and (3) that the defective design was a substantial factor in causing plaintiff's injury." *Cuntan v. Hitachi KOKI USA, Ltd.*, 2009

WL 3334364, at *5 (citing *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d at 109–10, 463 N.Y.S.2d at 402–04, 450 N.E.2d at 209). In establishing a design defect, the plaintiff must show that there was an economically and technically feasible alternative design available at the time the product was manufactured. *Ruthosky v. John Deere Co.*, 651 N.Y.S.2d, 717, 719, 235 A.D.2d 620, 622 (3d Dep't 1997). New York law requires plaintiffs to use expert testimony as to the feasibility and efficacy of alternative designs in order to prove a design defect. *See Cuntan v. Hitachi KOKI USA, Ltd.*, 2009 WL 3334364, at *6 (collecting cases); *Frazer v. ITW Food Equip. Grp. LLC*, No. 11 CV 9699, 2013 WL 6164486, at *5 (S.D.N.Y. Nov. 22, 2013) (explaining that "[a] party cannot survive summary judgment on a design defect claim without admissible expert testimony").

In this case, the Court finds that Mr. Barbe is not qualified to render an expert opinion as to whether the design of the Saw was defective. Since plaintiff has not proffered any other expert to give such testimony, under New York law, plaintiff will be unable to sustain his burden of proving that the Saw was, in fact, defective. As such, there is no genuine issue of material fact in dispute on this issue and thus, plaintiff's claims of negligence, strict liability and breach of warranty based on design defect fail.

Accordingly, the Court respectfully recommends that the defendant's motion for summary judgment as to claims based on a design defect be granted.

### 2) *Failure to Warn*

■ Plaintiff also alleges that the Saw was defective because it did not contain adequate warnings. (*See* Compl. ¶ 12 (alleging that defendant "was careless and negligent in the ... labeling ... of the

[Saw]")).[35] A product may be defective where "the manufacturer failed to provide adequate warnings regarding the use of the product." *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d at 107, 463 N.Y.S.2d at 401, 450 N.E.2d at 207. As such, "[a] manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its products of which it knew or should have known." *Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d 289, 297, 582 N.Y.S.2d 373, 376, 591 N.E.2d 222, 225 (1992); *Urena v. Biro Mfg. Co.*, 114 F.3d 359, 366 (2d Cir.1997). While the adequacy of a warning is generally a question of fact to be resolved by the jury, *Urena v. Biro Mfg. Co.*, 114 F.3d at 366, and expert testimony is not required to prove that a warning is inadequate, *Billiar v. Minn. Min. & Mfg. Co.*, 623 F.2d 240, 247 (2d Cir.1980), here, plaintiff has provided no evidence, other than the testimony of Mr. Barbe, that the warnings at issue in this case were inadequate. To the contrary, labels on the Saw itself warned users: "Danger! Keep hands away from blade," and "to prevent kickback, use the blade guard and splitter for all through sawing," and "keep hands out of the line of the sawblade." (Def.'s Ex. E). Moreover, plaintiff admitted that he was aware of the risk of injury associated with using the Saw without a guard (Pl. Dep. at 67, 95), and that he had read and understood the warning labels on the Saw. (*Id.* at 128–30). In light of these facts, it is clear that the Saw's warnings were adequate, and there is no material issue of fact as to whether the Saw's warnings were defective.

Thus, plaintiff cannot, as a matter of law, establish that the Saw was defective, either due to a design defect or deficient warning. Since he must demonstrate a defect in order to sustain a products liability claim for any of his proposed theories of negligence, strict liability, or breach of warranty, the Court respectfully recommends that the defendant's Motion for Summary Judgment be granted in its entirety.

### CONCLUSION

For the foregoing reasons, the undersigned respectfully recommends that defendant's motion to preclude the testimony of plaintiff's expert Mr. Barbe and motion for summary judgment be granted.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b); *Small v. Secretary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

---

**35.** Defendant casts doubt on whether plaintiff adequately stated a claim for failure to warn in his Complaint. (*See* Def.'s Mem. at 31–32 (arguing that defendant is entitled to summary judgment on plaintiff's failure to warn claim "[t]o the extent there even is a failure to warn claim in the Complaint")). Indeed, plaintiff includes no facts in his Complaint that would support his claim that the Saw's warnings were deficient. While the Court doubts that plaintiff adequately stated a claim for failure to warn, *see Ashcroft v. Iqbal*, 556 U.S. 662, 681, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (holding that "bald" and "conclusory" allegations in a complaint are insufficient to state a claim), since defendant has argued that it is entitled to summary judgment on this issue, the Court assumes for purposes of this motion that plaintiff stated a claim for failure to warn.